**EXECUTIVE EMPLOYMENT SERVICE, INC.,**

v.

**EXECUTIVES UNLIMITED, INC.**

**Civ. A. No. 27399.**

United States District Court
E. D. Pennsylvania.

Jan. 6, 1960.

J. Grant McCabe, III (of Duane, Morris & Heckscher), Philadelphia, Pa., for respondent.

**VAN DUSEN, District Judge.**

The motion to dismiss the application for a preliminary injunction now before the court, which was made at the conclusion of the plaintiff's case on the hearing of such application held December 28, 1959, must be granted for each of the following reasons:

A. Plaintiff has not sustained its burden of showing irreparable injury during the pendency of the action. See Sims v. Greene, 3 Cir., 1947, 161 F.2d 87, 89; Texaco, Inc. v. O'Connell, D.C.E.D. Pa.1959, 174 F.Supp. 820.

Plaintiff's witnesses testified that, among applicants, employers and the public, there would be confusion between the names used by plaintiff and respondent. The only types of confusion mentioned in the evidence were just as likely to result in benefit to the plaintiff as to respondent, since there will be increased advertising of the name "Executive" (see Exhibit P–7), and plaintiff's long operation in this area would lead people to associate that name with its organization. Such evidence as there is indicates that respondent, as well as plaintiff, operates in a reputable manner. Plaintiff's Exhibit 5–F shows that in Boston, where respondent has its original and principal office, there are four employment services starting with the name "Executive" or "Executives," so that there is no reason to believe that respondent intends to take advantage of plaintiff's good will by using this name in this area. Plaintiff has not sustained its burden of showing that it will sustain irreparable injury during the pendency of the action from such confusion as may result, assuming the accuracy of plaintiff's testimony on the issue of confusion.[1]

James F. Masterson, and G. Fred DiBona, Philadelphia, Pa., for plaintiff.

The plaintiff's reliance (page 3 of its memorandum filed 1/4/60, being Docu-

---

[1]. This is not the case of one unusual or coined word being followed by another such word resembling it (see Telechron, Inc. v. Telicon Corp., 3 Cir., 1952, 198 F.2d 903, 909) but the case of, at most, a "weak" name (cf. Admiral Cor-

ment No. 7) on Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, 3 Cir., 1959, 268 F.2d 569, 574–575, on this point is difficult to understand since, in that case, (a) there was testimony of at least two expert witnesses to support the trial judge's finding of irreparable damage,[2] whereas no witness testified in this case as to the existence or extent of any damage, though the existence of some damage could be inferred from the testimony of confusion, and (b) the appellate court could find "no 'irreparable injury' threatening Bancroft which would warrant issuance of a preliminary injunction * * * ." (at page 574 of 268 F.2d).

■■ B. Plaintiff has not sustained its burden of showing that it is entitled to an interlocutory injunction, after a balancing of "the conveniences of the parties and possible injuries to them" as affected by the granting or withholding of the injunction, within the rule adopted by the United States Court of Appeals for the Third Circuit in Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, supra, at pages 574–575 of 268 F.2d.[3]

poration v. Price Vacuum Stores, D.C. E.D.Pa.1956, 141 F.Supp. 796, 799) which is entitled to a "narrower orbit of protection." Sears, Roebuck & Co. v. Johnson, 3 Cir., 1955, 219 F.2d 590, relied on by plaintiff, did not involve the grant of a preliminary injunction. It is also noted that the distinctive, ascending step mark used by respondent (see Exhibit P–5F) was the subject of an application for registration filed 9/4/58. See page 2 of Answer (Document No. 3).

2. At N. T. 296–7 and 300, one expert witness testified (Civil Action No. 25092) D.C., 175 F.Supp. 107:

"Normally, if it did not work out I think my own personal attitude would be that I would certainly not repeat on the same trade-mark; that's for sure.

"And I think it happens very often, after all, and I think that women who are very good shoppers, by and large, hate to be taken in by anybody, and I think they very quickly earmark a tarnished trade-mark, shall we say.

"Q. How about discussions among your friends? A. Well, I think particularly any women in the room know that whenever there is something of the kind happening, if it is a dress under a certain trade-mark that we have liked and we have admired and we find that it is slipping, it doesn't take very long for that to get around.

"Q. And the result is that you would buy no more of that trade-marked article? A. I think ordinarily one would not, no.

\* \* \* \* \*

"Q. Now do I understand that it is your opinion that a customer who would purchase a sweater such as the one before you and who had worn it say for three weeks and then had it washed, or maybe had it washed during that time, would be dissatisfied with that sweater? A. I feel quite confident that that is true, if she were at all careful about what she wore." (N. T. 300).

At N. T. 363–4 another expert witness testified:

"Q. What effect on Bancroft would it have to the introduction of sub-standard sweaters into the market having on the sweaters Bancroft's trade-mark Ban-Lon? A. Well, it would have a very bad effect in several ways. The first bad effect would be with the consumer herself. The whole key to our program's continued growth and success is satisfaction with these products by the consumer, so that we make many claims about the fine-wearing properties of these sweaters, and, in fact, when the customer buys them and they don't perform this way, of course, this gives us a very bad black eye and would reduce the demand for the finished product by the ultimate uses of that product.

"It would have other effects all the way down the line from the consumer back to the sweater manufacturer if the demand were reduced and the sweater manufacturer would have less tendency to buy the yarn used to make these sweaters. This would mean that our throwster licensees would do less business, less pounds of yarn would be produced and we would end up making less money in royalties. So it would very directly affect our income."

Based on this and other testimony, the trial judge adopted the following finding of fact:

"The sale of substandard sweaters under plaintiff's trademark 'Ban-Lon' would, and does, cause irreparable injury to the plaintiff (Craig Tr. 296 et seq.; Mersereau Tr. 363)." (Par. 36 of Document No. 23, as adopted by par. 1, page 2, of Document No. 24—Civil Action No. 25092).

3. This is hereinafter called the "Bancroft case."

Since in that case the court considered an injunction which indirectly required cutting labels out of sweaters and similar garments as one which compelled "the defendant to take affirmative action," it would certainly consider the injunction sought here [4] as one requiring the affirmative action of terminating respondent's local lease, discharging its local employees (the testimony shows at least one such employee is working at present), and doing the other steps incident to closing its local office as requiring "affirmative action," within the terms of the authority relied on at footnote 8 of the Bancroft case. In such situations, the burden is placed, by the Bancroft case, on the plaintiff to show the lack of inconvenience and harm to the respondent resulting from the issuance of a preliminary injunction in areas peculiarly within the respondent's knowledge and control,[5] and this burden has not been sustained by plaintiff on this record. The plaintiff has not shown the investment made by the respondent in its Philadelphia office, the number of employees under contract for work here, etc.,[6] even though the record shows plaintiff knew, for at least a month prior to the leasing of such office (since October 15, 1959), that respondent planned to do business here if it secured the necessary permission from the Pennsylvania authorities. The fact that plaintiff threatened respondent with suit [7] prior to October 15 is not significant under the Bancroft case, since the record in that case is replete with threats by plaintiff to take action if respondent did not promptly change its manufacturing process to comply with the terms of the licensing agreement (see paragraph 37 of Document No. 23 in Civil Action No. 25092 and exhibits referred to in that paragraph).

Under these circumstances, it is not necessary to pass on respondent's contention that a word such as "Executive" is descriptive and not entitled to equitable protection, even on final hearing, particularly where there is nothing in the record to indicate any intent by respondent to trade on plaintiff's name. Cf. Telechron, Inc. v. Telecon Corp., 3 Cir., 1952, 198 F.2d 903, 905–906; Schulmerich Electronics, Inc. v. J. C. Deagan, Inc., 1953, 202 F.2d 772, 778, 40 CCPA 857; Faciane v. Starner, 5 Cir., 1956, 230 F.2d 732; Sears, Roebuck & Co. v. Johnson, supra.

As part of its proof that the respondent's name was so similar to the plaintiff's that the public would be confused, the plaintiff offered the testimony of one of its employees that he received a telephone call from a man who stated that he was calling with reference to an advertisement which appeared in the Wall Street Journal on December 16,

4. See paragraph 1, page 3, of Complaint.

5. See page 574 of 268 F.2d, where the burden is placed on the plaintiff of showing the size of defendant's inventory and the time when each item in it was manufactured, even though the defendant had been repeatedly (for example, August 26, 1957, September 10, 1957, October 21, 1957, March 3, 1958, March 13, 1958) warned that it was manufacturing goods in violation of the license agreement (see pars. 13–37 of Document 23 and par. 1 of Document 24 in Civil Action No. 25092) and as recently as 4½ months before suit, defendant had stated it was complying with the license agreement (par. 28 of Document 23 in Civil Action No. 25092). Even though defendant's officers were not fully available during the trial (for example, at N. T. 931, the trial judge stated that he wished to question the President of defendant, but this proved impossible), the action in the Bancroft case was based, at least in part, on the absence from the record of facts within the defendant's control.

6. The record does show that respondent has a two-year lease requiring rental payments of over $150 per month and that it has one employee working at present in its Philadelphia office (December 28), but extensive advertising arrangments for the Philadelphia area and contractual arrangements with other employees, who may be starting work in 1960, etc., may have been made and may be very costly for respondent to terminate.

7. Suit was begun on December 9 and service of the Complaint was made on respondent's local office on December 15.

1959 (Exhibit P–7). It is conceded that this was the advertisement of respondent. The respondent objected to this evidence as hearsay. The plaintiff stated that, while the person who made the telephone call was available to testify, it would be embarrassing for him to do so since his present employer might be appraised of the fact that he was inquiring about other job opportunities.

Conduct or utterances may be admitted without violating the hearsay rule as circumstantial evidence of the speaker's state of mind where his state of mind is relevant, and statements asserting one's present state of mind are admissible under the "State of Mind Exception" to the hearsay rule when made under non-suspicious circumstances. Nuttall v. Reading Company, 3 Cir., 1956, 235 F.2d 546, 551–553. Since it is not disputed that the caller was referring to respondent's advertisement, this court sees no hearsay objection to the statement coming in as circumstantial evidence of the speaker's state of mind, namely, that he thought he was calling the respondent. The relevant question, however, is what induced this state of mind. Any statements of the caller as to what induced his belief would be objectionable as violative of the hearsay rule and should not be admitted without the respondent having an opportunity to cross-examine him on this point.[8] Since respondent has conceded that the caller had its advertisement before him at the time he telephoned, it might be inferred that something in the ad made him think he was calling the respondent, and conceivably it was the presence of the name "Executives Unlimited, Inc." But there are other possible explanations as to why the caller telephoned plaintiff, as well as the similarity of the names alone. For example, the advertisement states no telephone number, although it lists a Philadelphia address. If the caller looked in the Philadelphia Telephone Directory, he would have found only the plaintiff's organization listed (page 393 of 1959 Yellow Pages and page 363 of 1959 Philadelphia Telephone Directory). He may have called plaintiff's number without a careful check, whereas if respondent's name had also been listed, he may have rechecked the name in the advertisement and not have been confused by the similarity of the first word of the names. Thus this particular evidence is of very little weight to show that a reasonable man would be confused by the similarity of the first word in the names alone.[9] The caller can testify under arrangements which would minimize, if not completely eliminate, any chance of his present employer learning of his activities,[10] even if this is considered a valid excuse for not producing him. Under these circumstances, the court does not think it is fair or proper for it to make the inferences the plaintiff desires from the facts of this call when the caller could be produced and explain, subject to cross-examination, what induced his belief that he was calling the respondent.[11]

8. Cf. Nuttall v. Reading Company, supra. It should be noted that in Nuttall, both parties to the conversation were dead and unavailable to testify. This fact was clearly in the court's mind when it made its decision. At page 552, the court stated:
"Unfortunately, both parties to the conversation are dead. Neither can minimize enlarge, explain, or otherwise make any commentary upon the words Mrs. Nuttall heard her husband use on that morning of January 5th."

9 Cf. Sears, Roebuck & Co. v. Johnson, 3 Cir., 1959, 219 F.2d 590, at page 592, note 3. The court did not need the evidence offered there to reach its decision and, therefore, did not express its views as to the weight to which it was entitled. The number of calls involved in that case (150–200) distinguishes it from the case at bar, in any event.

10. The court can restrict such part of the notes of testimony to counsel for the parties only, with instructions that they are not to make it public.

11. Cf. National Tube Co. v. Kennedy, 3 Cir., 1927, 20 F.2d 824; Burch v. Reading Company, D.C.E.D.Pa.1956, 140 F. Supp. 136, 163, 164, affirmed, 3 Cir., 1957, 240 F.2d 574; and footnote 8, supra.

Since respondent has filed its Answer, the case may now be ordered on the trial list and will be reached for trial in approximately one year. If respondent should operate in an inequitable manner, a motion for preliminary equitable relief, with appropriate allegations, may be filed. It may be that the inclusion of the distinctive, ascending step device (see footnote 1) in all of respondent's advertising will prevent any confusion.

### Order.

And Now, January 6, 1960, It Is Ordered that the application of plaintiff for a preliminary injunction is denied.