**BARTLETT & COMPANY, GRAIN,**
Appellant,

v.

The **MERCHANTS COMPANY,** Appellee.
The **MERCHANTS COMPANY,**
Appellant,

v.

**BARTLETT & COMPANY, GRAIN,**
Appellee.

No. 20210.

United States Court of Appeals
Fifth Circuit.

Oct. 3, 1963.

---

502

William E. Suddath, Jr., Jackson, Miss., Henry G. Eager, Charles B. Blackmar, Kansas City, Mo., William E. Suddath, Jr., Jackson, Miss., Watkins & Eager, Jackson, Miss., Swanson, Midgley, Jones, Blackmar & Eager, Kansas City, Mo., of counsel, for appellant.

Billy H. Quin, Vicksburg, Miss., Brunini, Everett, Grantham & Quin, Vicksburg and Jackson, Miss., of counsel, for appellee.

Before CAMERON and WISDOM, Circuit Judges, and DeVANE, District Judge.

WISDOM, Circuit Judge.

This action is for breach of contract. The subject of the contract is a barge load of corn which, according to official inspection certificates, was one grade when shipped and two very different grades when it reached its destination. As we see it, the case turns on the construction of a contract which contains two apparently inconsistent provisions. The overall issue is whether the loss should fall on the purchaser or the seller. The district court decided in favor of the buyer. We reverse and remand.

The Merchants Company, and buyer and appellee, is a Mississippi corporation. As the Vicksburg Terminal Division, it is in the business of buying and selling grains. As the Valley Mills Division it manufactures feeds. Bartlett and Company, the seller and appellant, is a Missouri Corporation which maintains grain storage facilities in six mid-western states, including terminal elevators on

the Missouri River at Nebraska City, Nebraska. Its general offices are in Kansas City, Missouri.

Merchants contracted through a broker to purchase from Bartlett four barge loads of No. 2 yellow corn. The terms and conditions of sale are found in three documents: (1) a confirmation order from Bartlett to Valley Mills (Merchants); (2) a confirmation order from the broker to both parties; and (3) a confirmation of purchase from Valley Mills (Merchants), signed "accepted" by B. O. Cottier, Bartlett's official secretary in charge of merchandising. The contract called for four barges of No. 2 yellow corn at 5¼ cents under the Chicago July option, F. O. B. the buyer's barges, *"If seller elects to load at Nebraska City 'In Barge' Official Weights & Grades to Govern."* Merchants's confirmation order, accepted by Bartlett's representative, contained the following clause: "Mark bills of lading 'inspection allowed'. If draft is paid at sight, *we do not waive our right to reject shipment in event quality proves to be below contract grade."*

Bartlett loaded four double-skin barges, furnished by the buyer, at Nebraska City, Nebraska, on June 19, 1959. The grain in only one of these barges, ABL-2519, is involved in this dispute. That barge was examined at Nebraska City by a federally licensed grain inspector, who, on the date the loading was completed, certified that the barge contained No. 2 yellow corn. Meanwhile, since Merchants had sold four barges of No. 2 yellow corn to O. J. Walls in Guntersville, Alabama, Merchants routed the barges to Guntersville and applied the grain in barge ABL-2519 on the Walls contract. While the barge was in transit from Nebraska City to Guntersville, Merchants paid Bartlett for the grain by draft with the bill of lading attached.

The grain arrived in Guntersville on July 7. Walls first discovered it to be partly "overheating and musty" on July 13. He refused to accept it, since it was below contract grade, and he called for a federal appeal grade inspection. At this inspection, on July 16, 1959, it was certified that approximately 17,000 bushels of the corn in barge ABL-2519 were No. 1 yellow corn and approximately 15,000 bushels were sample grade [1] yellow corn. Walls agreed to handle the barge for Merchants's account and accordingly unloaded, trucked, dried, turned, stored, and again trucked the grain. For these services he charged $7,164.61 and deducted that amount from Merchants's invoice. Both parties to this action agree that these charges were excessive, but Merchants contends that no one else was available to perform the services.

Merchants then sued Bartlett, seeking $7,164.61 for breach of contract and $5,000 in punitive damages. The suit was originally brought in a Mississippi state court as an attachment in chancery (a quasi-in rem action) by attaching Bartlett's deposits in a Mississippi bank. The suit was removed to the United States District Court for the Southern District of Mississippi where it was tried before the court without a jury. The district court found that the grain inspection certificate of June 19, 1959, at Nebraska City "was erroneous and inaccurate"; that it was "not fair * * * and failed to reveal the true condition in this barge on the date of shipment".

1. Sample grade includes corn which does not come within the requirements of any of the grades from No. 1 to No. 5, inclusive; or which contains stones and/or cinders; or which is musty, or sour, or heating, or hot; or which has any commercially objectionable foreign odor; or which is otherwise of distinctly low quality. U. S. Dep't of Agriculture, Agricultural Marketing Service, Official Grain Standards of the United States 17 (1957).

To meet the requirements for No. 1 grade corn, the corn must weigh at least 54 lbs./bu. and have less than 14% moisture, 2% cracked corn and foreign material, and 3% damaged kernels. Corn meeting the standards for No. 2 grade weighs at least 53 lbs./bu. and has less than 15.5% moisture, 3% cracked corn and foreign material, and 5% damaged kernels. See Ibid.

The district court found that "an inescapable inference from the evidence * * * [is] that barge was loaded in Nebraska City with an excessive amount of molded wheat which contaminated the cargo and accounted for the unsalable condition at Guntersville." The court held that Merchants was not bound by the certificate's recitals, because of the clause in Merchants's purchase confirmation, accepted by Bartlett, giving the buyer the right to reject shipment in the event that the quality proved to be below contract grade. The court awarded damages in the amount of $6,500 with six per cent interest from July 3, 1959, against the funds in the hands of the resident bank. The suit was dismissed as to Bartlett personally for lack of in personam jurisdiction. The court declined to award punitive damages, since the court found no evidence of gross negligence, willfulness, or oppressiveness on the part of the seller.

On appeal, Bartlett makes two major contentions. First, Bartlett contends that there is no evidence the grain in barge ABL-2519 was other than No. 2 yellow corn when it left Nebraska City in the buyer's barge. Second, the official grade certificate at origin should have been conclusive under the terms of the sale agreement, in the absence of gross neglect or willful wrongdoing.

■■ Both parties have acted on the assumption that the legal questions are to be determined by the substantive law of Missouri. The negotiations and the acceptance of the contract were all carried on in Missouri, and that state has sufficient contacts with the transaction to warrant the application of its law. Mississippi, the state in which this action was brought, would recognize the parties' mutual choice as to which law should govern in this situation. See Castleman v. Canal Bank & Trust Co., 1934, 171 Miss. 291, 156 So. 648. Under Klaxon Co. v. Stentor Elec. Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, governing the choice of law in diversity cases, we follow Mississippi's rules and give effect to the intention of the parties to be governed by Missouri's substantive law. To the best of our ability, therefore, and to the extent that these are Missouri cases in point, we have relied on Missouri cases, notwithstanding their antiquity.

## I. THE BUYER'S RIGHT TO INSPECT

■ A buyer dealing with a distant vendor and purchasing goods of a specified quality without first seeing them has a right to inspect them upon receipt. Pope v. Allis, 1885, 115 U.S. 363, 372, 6 S.Ct. 69, 29 L.Ed. 393 (dictum); see Rivers Bros. Co. v. Putney, 1921, 27 N.M. 177, 199 P. 108, 27 A.L.R. 520 at 522; Fore v. Plant Seed Co., Mo.Ct.App. 1921, 232 S.W. 169. And, in the absence of any contractual provision to the contrary, the buyer may reject an F.O.B. shipment at destination. N. W. Helm Feed & Coal Co. v. Butler County Milling Co., 1925, 218 Mo.App. 290, 269 S.W. 630; Fore v. Plant Seed Co. But the parties may agree instead to abide by the judgment of another, and that judgment, if honestly exercised, is binding on the buyer. Del Bondio v. Jacob Dold Packing Co., 1899, 79 Mo.App. 465; see Great Atl. & Pac. Tea Co. v. Smith, W.D.Ark., 75 F.Supp. 156, aff'd 8 Cir., 1948, 170 F.2d 474; 46 Am.Jur., Sales § 248; cf. Arkla Lumber & Mfg. Co. v. Henry Quellmalz Lumber & Mfg. Co., Mo.1923, 252 S.W. 961 (seller also bound). The buyer cannot thereafter substitute his own inspection for that conducted by the third party. In Gratiot St. Warehouse Co. v. Wilkinson, 1902, 94 Mo.App. 528, 68 S.W. 581, a contract for sale provided that corn was to be shipped F.O.B. St. Louis, Missouri, "St. Louis inspection" to Jackson, Mississippi. The St. Louis inspection showed the corn to be in good condition but upon its arrival in Jackson the purchaser refused to accept it because an inspection there ascertained it to be wet, moldy, and rotten. The court, however, found that the St. Louis inspection was conclusive as to grade and quality, and stated,

"We need not stop to inquire whether the title passed to appellants when

the grain was delivered to the carrier in St. Louis to be transported to Jackson. It is enough that they had agreed to buy on St. Louis inspection. When that inspection determined the grain was of the quality ordered, they became bound by their agreement to accept and pay for it when it reached Jackson, and are responsible for the damages respondent sustained by their refusal to do so." 68 S.W. at 585.

Such an inspection is held to have a conclusive effect even if there is no express provision in the contract that it shall be final. E. g., Chapman v. Kansas City, C. & S. R. Co., 1893, 114 Mo. 542, 21 S.W. 858; Massman Const. Co. v. Lake Lotawana Ass'n, 1948, 240 Mo.App. 469, 210 S.W.2d 398; see Rogers v. Rehard, 1906, 122 Mo.App. 44, 97 S.W. 951, 953.

The contract in question here provides that "'in barge' official *weights & grades*" are to govern—if the shipment is made from Nebraska City. But —if the shipment is made from Omaha, although "official 'in barge' grades" still govern, "*destination official weights*" are to govern. Thus, the contract is drawn to distinguish between an inspection where the grain is loaded and an inspection at its destination. An inspection at the destination is to determine the *weight*, if the grain is loaded at Omaha. That is the only circumstance in which a destination inspection is to control. The terms of the contract therefore required that the transaction be governed by the origin *grades and weights*, since the grain was shipped from Nebraska City.

■■■ As we noted, where an inspection by a third party is stipulated, it supersedes the buyer's right to inspect. Merchants, however, seeks to avoid this result by urging that the clause in its printed form contract, which was accepted by Bartlett's agent, gave it the right to inspect at destination and to reject the shipment if the *quality* proved to be below the specified grade at the destination. This interpretation of the contract would nullify the provision for inspection at origin. The obvious purpose of that inspection at origin was to establish a certain, reliable, and objective standard at a fixed place and time to give the transaction certainty. It would serve little use to have this inspection, if the buyer were free to accept or reject the shipment after its arrival on the basis of its own inspection at destination. To the extent then that the *printed* clause in the contract may be interpreted to allow Merchants the right, for which it contends, to reject on the basis of its own destination inspection, it is inconsistent with the *typewritten* clause providing for one official inspection at origin. In such case the typed portions prevail. Saranac Automatic Mach. Corp. v. Duke, 5 Cir., 1933, 67 F.2d 436; see Collins v. Roth, Mo.Ct.App.1949, 224 S.W.2d 129, 132; Belt Seed Co. v. Mitchellhill Seed Co., 1941, 236 Mo.App. 142, 153 S.W.2d 106, 110.

■■ The contract before us, however, may be construed so as to reconcile the two clauses and thus satisfy the very sensible canon of construction requiring that effect be given to all terms of the contract. The typed clause provides that official grades are to govern, whereas the printed clause, upon which Merchants relies, reserves to it the "right to reject shipment *in event* quality proves to be below *contract grade.*" (Emphasis supplied.) This gives Merchants the right to reject, *if* the quality does not satisfy the contractual requirements; it does not give Merchants the right to determine *whether* the quality measures up to the standard specified. Thus Merchants could reject the grain, if the grade given it by the Nebraska City inspector proved to be lower than that specified in the contract, but the reservation clause does not give it the power to ascertain the grade independently of the origin inspection. Furthermore, this reserved right to reject is expressly conditioned on the draft being paid at sight. Since it is possible that the draft would be paid before receipt of the inspection certificate, this is a reasonable provision. It simply avoids any question that payment

of the on-sight draft might be deemed a waiver of the right to reject the shipment. See Ryder & Brown Co. v. E. Lissberger Co., 1938, 300 Mass. 438, 15 N.E.2d 441, 118 A.L.R. 521, 525–526, in which the court assumed that the right to reject is lost when the title passes to the buyer on payment of a sight draft.

The testimony of Merchants's agent shows that in the customary dealings in the trade lower prices are fixed on condition that there is no right to reject on the basis of a destination inspection when the grain is inspected at origin. Mr. Harriss, Merchants's manager, agreed that Mr. Walls, who received the shipment in Alabama and bought on the same terms as Merchants, had no right to inspect the shipment at Guntersville. Moreover, the broker testified that his confirmation order showed the entire arrangement between the two parties; that it contained no right to reject. We hold, therefore, that Merchants did not have any right to reject the shipment destination on the basis of inspection at destination.

## II. THE CONCLUSIVENESS OF THE INSPECTION CERTIFICATE

Our next question is the weight to be accorded the certificate of inspection issued at Nebraska City. Merchants contends that it should not be binding on the parties, either because of Merchants's reserved right to reject, or because the inspection did not meet the standards contemplated by both parties. We have already disposed of the first contention. In support of its second, Merchants contends the inspection was not proper because the inspector took samples every five minutes as the grain was being loaded, whereas he should have taken them at least once every minute. In addition, he omitted from his certificate the percentage of foreign material which he found in the corn, an omission that is a violation of a United States Department of Agriculture regulation prescribing that each inspection certificate have the statement of the factors determining the grade if not No. 1 (the

foreign material percentage here made the corn No. 2 instead of No. 1). Merchants's primary reliance, however, is upon the inspector's failure to issue separate certificates, again as required by regulation, showing material portions of the cargo to be of different grades. According to the inspector's deposition, the first 500,000 pounds loaded contained 3.7% foreign matter, which would have made that corn No. 3 grade, and the next 400,000 pounds contained 5% foreign matter, which would drop the grade to No. 4. Upon discovering this variance from the grade specification, he notified Bartlett that the corn being loaded was below No. 2 grade specification, whereupon Bartlett "cleaned the remaining portion of the corn", with the result that the samples from the last 850,000 pounds loaded met the standards for No. 2 or No. 1 grade corn. Merchants contends that the information disclosed by these samples made it mandatory for the inspector to issue separate certificates for the distinct portions of the cargo, instead of issuing the certificate showing that the entire cargo averaged out to No. 2 grade yellow corn.

An inspection certificate is conclusive and final upon the parties in the absence of fraud, bad faith, or such gross mistake as amounts to fraud. See, e. g., Massman Const. Co. v. Lake Lotawana Ass'n., 1948, 240 Mo.App. 469, 210 S.W.2d 398. In Gratiot St. Warehouse Co. v. Wilkinson, the St. Louis inspection certificate, the one made at origin, was held to be final as to the grade and quality of the corn shipped in the absence of any evidence to impeach the inspection as dishonest or collusive. To set aside the results of an inspection it is not enough that there be a simple mistake. For example, where parties to a contract for the sale of a business agreed that the value was to be determined by two appraisals, and one party alleged that the appraisals mistakenly included two items of wire in their appraisal, a Missouri court of appeals held that the appraisal was not subject to attack for mistake. Rogers v. Rehard, 1906, 122 Mo.

**508**

App. 44, 97 S.W. 951; see Federal Grain Co. v. Hayes Grain & Comm. Co., 1923, 161 Ark. 51, 255 S.W. 307. Furthermore, a mere difference in grade determined by a destination inspection, as against an origin inspection, was held not to constitute evidence showing fraud or gross mistake from which fraud could be inferred. Hayes Grain & Comm. Co. v. Federal Grain Co., 1925, 169 Ark. 1072, 277 S.W. 521. To allow a mere mistake or error in the decision of an umpire to nullify his decision would make the chosen means of avoiding litigation—breed litigation. Alabama Chem. Co. v. International Agricultural Corp., 1926, 215 Ala. 381, 110 So. 614, 615. Nevertheless, a gross mistake in the inspection may suffice to overturn the inspection certificate. Herman H. Hettler Lumber Co. v. Olds, 6 Cir., 1915, 221 F. 612; see Alabama Chem. Co. v. International Agricultural Corp.

In Blum Milling Co. v. Moore-Seaver Grain Co., Tex.Com.App.1925,[2] 277 S.W. 78, in which Merchants relies, there is language indicating that any incorrect inspection is not binding. In that case, however, the inspection was grossly inadequate, and the court was convinced that the inspection report and the testimony of the inspector affirmatively showed gross mistake or dishonesty in the inspection. Moreover, the court found that the parties had not agreed that any one inspection was to be incontrovertible. Here, of course, the parties had specifically agreed upon an inspection. A more recent Texas case follows the rule that the determination of a common agent is final and conclusive in the absence of fraud or bad faith. See Texas Gas Corp. v. Hankamer, Tex. Ct.Civ.App.1959, 326 S.W.2d 944, 955.

The other authorities the appellee cites support the view that the inspection is to be accorded conclusive effect in the absence of fraud or bad faith. For

example, in Herman H. Hettler Lumber Co. v. Olds, the court said:

"[W]here * * * the inspector is agreed upon * * * the inspection is impeachable only by clear proof of either fraud or of mistake so gross as to be in effect equivalent to a fraud, and * * * proof of only an honest error of judgment in the chosen inspector, even if there were as an effect a measurable difference of results from those obtained by other equally reliable inspectors, cannot be made available to overthrow the original conclusion." 221 F. at 616.

See Hayes Grain & Comm. Co. v. Federal Grain Co., 1925, 169 Ark. 1072, 277 S.W. 521.

In the case before us, the district court found the inference inescapable that "this barge was loaded in Nebraska City with an excessive amount of molded wheat which contaminated the cargo and accounted for its unsalable condition in Guntersville. * * * [A]ltogether the shipment contained a large quantity of No. 1 corn, it contained a substantial quantity of No. 4 grade corn together with this molded wheat and the quality of grain did not average out to the lowest quality for which the parties contracted." The court concluded therefore that the inspector's certificate "was not fair or accurate and erroneously neglected and failed to reveal the true condition of this cargo in this barge on the date of shipment, and the Plaintiff was and is not bound thereby."

█ Usually in a sale of this nature the burden of proof would be on the seller to show he had delivered goods to the carrier in compliance with the contract, see Arkla Lumber & Mfg. Co. v. Henry Quellmalz Lumber & Mfg. Co., Mo.1923, 252 S.W. 961, and the trier of fact would properly make the determination whether the goods were of the quality stipulated.

2. There could not have been a mutual intent that an inspection which would result in classifying rotten wheat as No. 2 red wheat in good condition would be sufficient. Existence of that intent would reflect idiocy, or worse, and it will not therefore be presumed. Id., 277 S.W. at 83.

But, as we have seen, where the parties have agreed to an inspection, this inspection is conclusive on the issue and there can be no inquiry into it in the absence of fraud.

■ As we read the district court's findings and conclusions, the court did not decide whether there was fraud present in the inspection; the opinion merely characterized the certificate as "not fair or accurate." The court found "no gross negligence or willfulness or oppressiveness on the part of the seller". It does not appear whether this was intended to apply to the inspector's actions; only the seller is expressly absolved from gross negligence and willfulness. In the circumstances, we reverse and remand this case for the trial court to ascertain, in light of this opinion, whether there existed fraud, bad faith, or gross mistake amounting to fraud which would warrant setting the certificate aside.

■ On remand, the district court may wish to consider whether the difference between the grade certified by the inspector and the actual grade of the corn at the time of loading is so great as to constitute a mistake which would show fraud on the part of the inspector. Also, the court might consider whether the alleged deviations from prescribed inspection standards and the customary practices are flagrant enough to show bad faith or failure to exercise an honest judgment. If these show only a simple mistake or a mere error in judgment, the certificate should stand as conclusive.

III. DAMAGES

Bartlett has urged that the court below erred in awarding damages of $6,500 because the evidence was too speculative and indefinite.

■ Damages should represent the difference between the market value of the grain in good condition and the market value of the grain in its damaged condition, Neil v. Cunningham Store Co., 1911, 160 Mo.App. 513, 140 S.W. 947, measured at the time and place of shipment. Pratt v. Schreiber, 1923, 213 Mo.App. 268, 249 S.W. 449; see N. W. Helm Feed & Coal Co. v. Butler County Milling Co., 1925, 218 Mo.App. 290, 269 S.W. 630, 632. The general rule that the seller of chattels to be shipped is not responsible for deterioration in transit, see Texas Star Flour Mills Co. v. Moore, D.C.Mo.1910, 177 F. 744, 755, is subject to the exception that if the damaged condition at the end of the shipment results from the fact that the goods were not in proper condition when loaded, then the seller is responsible, Hoffman v. Wisconsin Lumber Co., Mo.Ct.App.1924, 262 S.W. 414. If it should be found that moldy wheat was loaded on barge ABL-2519 at Nebraska City and directly caused further deterioration in the quality of the corn, then the damages would properly include the difference in market value at Nebraska City plus the loss caused by deterioration in transit. The expense incurred in reconditioning the corn at Guntersville is not necessarily a proper measure of damages unless it is found to be an item of special damage naturally and proximately resulting from the breach. Mayfield v. George O. Richardson Mach. Co., 1921, 208 Mo.App. 206, 231 S.W. 288.

IV. MERCHANTS'S CROSS-APPEAL

One final point to be considered is Merchants's allegation of error in the trial court's refusal to admit in evidence a letter purportedly from the Nebraska City grain inspector to Merchants's manager. The writer of the letter relates that a few days before the loading, a small amount of off-grade wheat was accidentally dumped on a tank of corn and that this load was then loaded in a barge. Merchants does not seek to introduce the letter to show that corn with off-grade wheat in it was actually loaded on the barge, but rather to show that the inspector had knowledge of off-grade wheat being mixed with corn at the time of the loading. This type of evidence, Merchants asserts is not objectionable hearsay, since the knowledge of the grain inspector is relevant to show whether his certificate was properly

made and his statements are evidence of his knowledge.

■ Declarations may be introduced to show the state of mind of the declarant when he made them. Mutual Life Ins. Co. of New York v. Hillmon, 1892, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706. People of State of Cal. v. One 1948 Chevrolet Coupe, 1955, 45 Cal.2d 613, 290 P.2d 538, 55 A.L.R.2d 1272; see 6 Wigmore, Evidence § 1714 (3d ed. 1940); 20 Am.Jur. Evidence § 585. But in this case the letter was written on November 5 about four and one half months after the inspection. If it does show knowledge on the part of the inspector that bad wheat was loaded in the barge, it does not give any indication that he had such knowledge when he made out the certificate, the only time relevant to the purpose that could justify its admission. This case is thus distinguishable from Yazoo City v. Loggins, 1927, 145 Miss. 793, 110 So. 833, on which Merchants relies. That case involved an action against the city for injuries sustained in a fall into an unlighted trench across a sidewalk. The city alleged in defense that it had no knowledge of the existence of the trench. The court there held that a statement by the city street commissioner that he had seen the trench was admissible to show the city had actual knowledge of the existence of the trench prior to and at the time of the injury, but not to establish the existence of the trench. Similarly, in Dixie Drive It Yourself Sys. Jackson Co. v. Matthews, 1951, 212 Miss. 190, 54 So.2d 263, a statement by the agent of an automobile leasing company that one who had rented one of the cars and who had just been involved in an accident was drunk was held competent and relevant to show the company's knowledge of its lessee's habits of drink at the time the car was entrusted to him. These cases both differ from the situation at hand because the statements involved showed knowledge at the time of the occurrence in question. Here, however, the declaration tended to show only that the inspector had knowledge of the molded wheat at a

time subsequent; hence the proffered evidence was immaterial and irrelevant. Cf. Shepard v. United States, 1933, 290 U.S. 96, 105–106, 54 S.Ct. 22, 78 L.Ed. 196; 6 Wigmore Evidence § 1729, at 91 (3d ed. 1940). We hold that the court below was not in error in excluding it.

The judgment is reversed and remanded for proceedings consistent with this opinion.