532 F.2d 1291
 19 UCC Rep.Serv. 228, 1 Fed. R. Evid. Serv. 1124
 SEATTLE-FIRST NATIONAL BANK, a National Banking Association,
Plaintiff-Appellant,
v.
Jean Frances RANDALL and Ressie F. Proudfit,
Co-Administrators with the Will Annexed of the
Estate of Edith B. Sefton, Defendants-Appellees.
 No. 74-2391.
 United States Court of Appeals,
Ninth Circuit.
 March 24, 1976.
 
 L. M. Giovanini (argued), Beaverton, Or., for plaintiff-appellant.
 William T. Powers (argued), of Powers & Powers, Portland, Or., for defendants-appellees.OPINION
 Before BARNES, ELY and WALLACE, Circuit Judges.
 BARNES, Senior Circuit Judge:
 
 
 1
 This appeal is brought by plaintiff Seattle-First National Bank against defendants Jean Frances Randall and Ressie F. Proudfit, co-administrators of the estate of Edith B. Sefton, seeking a declaration that Sefton was competent on February 2, 1968, when she pledged 1,434 shares of Northwest Industries stock valued at $100,000 to the bank as collateral to secure loans made by the bank to Ruson Laboratories, Inc. The bank also seeks a decree authorizing it to sell the stock.
 
 
 2
 Jurisdiction in the district court is based on 28 U.S.C. 1332 as there is diversity of citizenship and the amount in controversy, exclusive of interest and costs, exceeds $10,000. This Court has appellate jurisdiction under 28 U.S.C. 1291.
 
 
 3
 The District Judge found that plaintiff bank was not entitled to any relief and ordered the bank to deliver to the guardian of Edith B. Sefton, the 1,434 shares of Northwest Industries stock and all accumulated dividends free from the pledge and any other claim which the bank had asserted. We affirm.
 
 
 4
 The relevant facts are adopted from the District Judge's opinion (CT 210-13). Rollin Emerson was president and controlling shareholder of Ruson Laboratories, Inc., an Oregon corporation with its principal place of business in Portland. Ruson Laboratories had been dealing with the United States National Bank and The First National Bank in Portland. In the latter part of 1967, Emerson went to the plaintiff bank in Vancouver, Washington, and opened an account for the corporation there. Emerson's corporation needed bank loans to develop and exploit a patent owned by it for the relief of bed sores. Other than the value of the patent, Ruson had few assets. Plaintiff bank refused to lend money to Ruson without collateral. Ruson Laboratories had never made a profit during any year since its organization. By February 2, 1968, when Mrs. Sefton pledged her stock, Ruson had lost $617,598.68.[1] The bank recognized that the development of the patent was a highly speculative venture.
 
 
 5
 Emerson told the bank that he could persuade friends to put up collateral for him. The bank knew that Emerson was an investment counselor. The bank arranged a $600,000 line of credit, but only with collateral.
 
 
 6
 Mrs. Sefton was 83 years old at the time of the transaction. She had known Emerson for more than 25 years. During all that time, he had been her investment counselor. Mrs. Sefton was one of the people Emerson asked to put up security for his corporation. Emerson testified that he never showed Mrs. Sefton a profit and loss statement nor income tax returns on Ruson Laboratories even though, a few years earlier, she had refused his request to buy Ruson stock. He persuaded Mrs. Sefton to pledge 1,434 shares of Northwest Industries stock valued at $100,000.
 
 
 7
 Emerson testified that Mrs. Sefton came to his office and offered the stock as collateral. His office was located across the street from the main branch of The First National Bank of Oregon, where Mrs. Sefton had an account. Apparently Emerson accompanied her to this bank, and in the presence of a bank officer she signed on February 2, 1968, an "authority to Hypothecate" form which gave Ruson Laboratories power to pledge her stock as collateral with plaintiff bank. Mr. Emerson, without Mrs. Sefton, delivered the signed form to plaintiff bank in Vancouver, Washington, which is approximately twenty miles from Portland. Apparently, Floyd B. Clark, an officer of plaintiff bank, failed to inquire about Mrs. Sefton from anyone other than Mr. Emerson, who informed him that she was a client of his for many years and that she was an older woman. Clark assumed that she was between fifty and seventy years old. He did not learn until much later that she was eighty-three years old at the time.
 
 
 8
 Mrs. Sefton kept diaries of her activities up to 1966. She made many notations about Mr. Emerson and her personal expenses. On August 5, 1963, she wrote, "I am very 'addled.' " On November 5, 1963, she said, "Memory very bad. Bad night." On November 23, 1963, she wrote, "My memory very bad." (Emphasis in diary). On June 4, 1964, she wrote, "Worried about Phila Rd (sic) stock in U S Bank. Mr. E tells me it will be released to me tomorrow." Entries on June 5 and 6, 1964, indicate no word was received from Mr. Emerson on the transaction. On April 3, 1965, she wrote, "Mr. Emerson called. Wanted me to buy Ruson stock. I said 'no.' "
 
 
 9
 Mrs. Proudfit, the neighbor who became Mrs. Sefton's guardian, testified that during 1968, she noticed that Mrs. Sefton "(j)ust kept getting worse and worse and more forgetful and doing odd things. . . ." Mrs. Proudfit also testified that in 1968 Mrs. Sefton had lost her judgment in financial matters. Prior to that time, Mrs. Sefton was so frugal that she had never made a charitable contribution. As Mrs. Proudfit testified, Mrs. Sefton "hung on to all of (her money). She was very interested in money. Money was first on her list."
 
 
 10
 A certified public accountant, Mr. Frederick Weber, at the request of Mr. Emerson, prepared Mrs. Sefton's income tax returns for the years 1961-1966 and 1968-1970. In the early part of 1968, at approximately the same time Mrs. Sefton became a gratuitous guarantor for Ruson, she went to the local IRS and State Tax Commission to prepare her income tax returns in order to save the fee for the preparation of the returns. In 1967, Mrs. Sefton came to Mr. Weber's office and then returned home and called back several times. According to Mr. Weber, "I asked her to look up some additional items. When she got home, she called back repeatedly to ask if she had the question right, and to repeat the answer. She seemed to forget she had called previously." Mr. Weber lacked information about Mrs. Sefton's 1967 returns, and he therefore filed for an extension, giving as his reason, "Taxpayer is in her late 80's, and is not as competent as formerly. Additional time is needed to get her information organized as to income from various investments."
 
 
 11
 At trial, the defendants asserted two affirmative defenses. First, they argued that a fiduciary relationship existed between Sefton and Emerson and that Emerson breached his fiduciary duty when he secured from Sefton the pledge of 1,434 shares of her stock. Second, defendants asserted that Sefton was incompetent at the time Sefton authorized Emerson to pledge Sefton's stock to the plaintiff bank. Defendants argued that they could assert either of these defenses against the bank since they contended that plaintiff bank was not a bona fide purchaser and, hence, was charged with notice of any adverse claim.
 
 
 12
 The District Judge held in favor of the defendants on all grounds. In regard to the affirmative defenses, the Court stated:
 
 
 13
 "When Mrs. Sefton pledged her stock and signed the agreement in favor of plaintiff bank, Emerson knew of her mental condition. He knew that she was a thrifty even a penurious person who was worried about money matters. He had already received a $25,000 check from her and was about to ask her for an additional $25,000. He knew that she would receive no compensation for having advanced this money and pledged this stock.
 
 
 14
 "Although Mrs. Sefton may not have been so mentally incompetent that a guardian or conservator should have been appointed for her in the early months of 1968, I find that age had taken its toll and that in 1968, and for several previous years, she was confused and often worried about money matters. She was incapable of making an informed business judgment, particularly when Emerson, her longtime friend and business counselor, was the other party to the transaction."It is true that Emerson lost a large amount of his own money in Ruson Laboratories and so did some of his friends and clients. I believe that Emerson hoped that the invention would prove successful and that he would make a large amount of money enough to pay all the loans and leave him with a substantial profit. But this hope and good intentions did not justify his getting Mrs. Sefton, an 83-year old woman who was his friend and client, to put up $100,000 in securities solely as a favor to him. The best she could get was the return of her stock and the money she advanced if this highly speculative endeavor was ultimately successful." (CT 213-14).
 
 
 15
 The District Court also held that the bank was not a bona fide purchaser and was thus charged with notice of the adverse claims and defenses asserted by the defendants. The Court said:
 
 
 16
 "Plaintiff bank knew of the corporation's continued losses, its lack of tangible assets, and its need for additional financing to further develop a patent which had not yet proved marketable. The bank also knew that Emerson was getting friends and clients to put up security because of the bank's decision not to make the corporation any unsecured loans. It also knew that Mrs. Sefton was aged and a gratuitous guarantor and that Emerson was her business consultant and friend.
 
 
 17
 "I find that from all these facts and circumstances, which the bank knew at the time in question, it had reason to know that its title to the securities was probably defective. ORS 71.2010(25); see also 78.3040(2).
 
 
 18
 "I also find that the bank's conduct fell far short of reasonable commercial standards. Under all the facts and circumstances, the bank was at least put on inquiry to find out more information about Mrs. Sefton and to determine whether she was capable of making an independent judgment on whether she should put up a substantial portion of her assets as a gratuitous guarantor for a man who stood in a fiduciary relationship with her.
 
 
 19
 "In my opinion, the bank failed to follow reasonable commercial standards or good banking practice, and on the basis of the facts that it knew and the facts that it could have obtained by reasonable inquiry, it was required to reject Mrs. Sefton as a gratuitous guarantor. The bank having accepted her stock is now charged with notice of the adverse claims and defenses asserted by Mrs. Sefton's guardian." (CT 214-15).
 
 
 20
 On appeal, plaintiff bank raises three alleged errors.
 
 
 21
 First: At trial, the trial judge admitted the diaries of Mrs. Sefton, which were in existence since before 1964, into evidence. Plaintiff bank argues that this constituted error as the diaries were inadmissible hearsay. If we assume that the objected to evidence was hearsay, it was clearly admissible under the state of mind exception, to the hearsay rule. As stated by Judge Wisdom, "(d) eclarations may be introduced to show the state of mind of the declarant when he made them." Bartlett & Company, Grain v. Merchants Company, 323 F.2d 501, 510 (5th Cir. 1963). It was for this very purpose that the diaries were admitted into evidence. See Federal Rules of Evidence 803(3); Nuttall v. Reading Company, 235 F.2d 546, 551 (3rd Cir. 1965); Executive Employment Service, Inc. v. Executives Unlimited, Inc., 180 F.Supp. 258, 262 (E.D.Pa.1960); State v. Shirley, 7 Or.App. 166, 170-71, 488 P.2d 1401, 1403 (Or.App.1971). Accordingly, the District Judge's ruling was proper.
 
 
 22
 Plaintiff bank argues that the diaries should have been ruled inadmissible for another reason, namely, that defense counsel did not show the diaries to plaintiff until the night before trial. Because the existence of these diaries was not disclosed during discovery, plaintiff claims the purpose of this procedure "was thwarted" by defense counsel. Any prejudice which plaintiff may have incurred was waived by it when it declined to accept the District Judge's offer for additional time in order to more thoroughly examine the diaries:
 
 COUNSEL FOR PLAINTIFF:
 
 23
 "First of all, in our request for interrogatories, we asked Mrs. Proudfit whether or not she had any documentary evidence or otherwise on the issue of competency. She indicated in her interrogatories that there was no other evidence. I understand from Counsel that they had this box of diaries in their possession for some time, but hadn't looked at them, Number one."
 
 DISTRICT JUDGE:
 
 24
 "Do you need more time? Is that what you are asking for?"
 
 COUNSEL FOR PLAINTIFF:
 
 25
 "No."
 
 DISTRICT JUDGE:
 
 26
 "I will give you more time if you need it to look at the diaries and open up the case if you want to." (RT 5-6).
 
 
 27
 Plaintiff was offered ample opportunity to examine the diaries. It declined to accept the District Judge's invitation. Plaintiff, therefore, has no valid reason to complain as to their admission or content.
 
 
 28
 Second: At trial, plaintiff bank attempted to introduce the bank's loan procedural manual which, claims plaintiff, was relevant and admissible to show that the bank complied with reasonable commercial standards in accepting Mrs. Sefton as a gratuitous guarantor. The District Judge refused to accept the manual into evidence on the grounds that the material was self serving. Plaintiff bank claims that this ruling constituted prejudicial error.
 
 
 29
 Specifically, plaintiff contends that the bank's loan procedural manual was admissible under the Business Records Exception to the Hearsay Rule. Plaintiff is clearly incorrect.
 
 
 30
 A. The manual failed to satisfy the necessary requirements in order to be considered as a Business Record. First, the manual was not "made as a memorandum or record of any act, transaction, occurrence, or event . . . ." 28 U.S.C. § 1732(a); see Ore.Rev.Stat. § 41.960. Rather, the manual was designed as a general guideline to enable the bank's lending officials to comply with certain standards during the course of a loan transaction. See Carroll v. United States, 326 F.2d 72, 77 (9th Cir. 1963); Bisno v. United States, 299 F.2d 711, 718 (9th Cir. 1961). (RT 78-79).
 
 
 31
 B. The manual was not made contemporaneously with the transaction or a reasonable time thereafter. 28 U.S.C. 1732(a); see Federal Rules of Evidence 803(6). As stated by Wigmore, "(t)he entry should have been made at or near the time of the transaction recorded, not merely because this is necessary in order to assure a fairly accurate recollection of the matter, but because any trustworthy habit of making regular business records will ordinarily involve the making of the record contemporaneously." 5 Wigmore, Evidence 1526 (3rd ed. 1940) (emphasis in original). Accord, Hiram Ricker & Sons v. Students International Meditation Society, 501 F.2d 550, 554 (1st Cir. 1974); United States v. Wilkinson, 460 F.2d 725, 736 (5th Cir. 1972); Kincaid & King Construction Company v. United States, 333 F.2d 561, 564 (9th Cir. 1964). Accordingly, the District Judge ruled properly in refusing to accept the manual into evidence.
 
 
 32
 Third: Plaintiff bank's last contention is that there is not sufficient evidence to support the findings of the District Judge that the bank failed to exercise due care in accepting Mrs. Sefton as a gratuitous guarantor. Rule 52 of the Federal Rules of Civil Procedure states in pertinent part: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." In interpreting this provision, the Supreme Court has recognized:
 
 
 33
 "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo. The authority of an appellate court, when reviewing the findings of a judge as well as those of a jury, is circumscribed by the deference it must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence. The question for the appellate court under Rule 52(a) is not whether it would have made the findings the trial court did, but whether 'on the entire evidence (it) is left with the definite and firm conviction that a mistake has been committed.' "
 
 
 34
 Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129, 148 (1969), quoting, United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746, 765 (1948).
 
 
 35
 Applying these principles to the facts of the case before us, we find that there clearly was sufficient competent evidence for the District Judge to conclude (1) that a fiduciary relationship existed between Mrs. Sefton and Mr. Emerson and that Emerson breached this duty when he pledged Sefton's 1,434 shares of stock to the bank, and (2) that Mrs. Sefton was incompetent at the time she authorized Emerson to pledge her stock to the bank. We believe that the facts recited earlier in our decision lend ample support for the above conclusions.
 
 
 36
 There is statutory law to support the District Judge's holding that plaintiff bank took with notice of adverse claims. Ore.Rev.Stat. § 78.3040(2) provides:
 
 
 37
 "The fact that the purchaser (including a broker for the seller or buyer) has notice that the security is held for a third person or is registered in the name of or endorsed by a fiduciary does not create a duty of inquiry into the rightfulness of the transfer or constitute notice of adverse claims. If, however, the purchaser (excluding an intermediary bank) has knowledge that the proceeds are being used or that the transaction is for the individual benefit of the fiduciary or otherwise in breach of duty, the purchaser is charged with notice of adverse claims."
 
 
 38
 (emphasis added). In the official comment to U.C.C. 8-304(2), which is identical to the preceding Oregon statute, the provision states:
 
 
 39
 "Mere notice of the existence of the fiduciary relation is not enough in itself to prevent bona fide purchase, and the purchaser is free to take the security on the assumption that the fiduciary is acting properly. The fact that the security may be transferred to the individual account of the fiduciary or that the proceeds of the transaction are paid into that account in cash would not be sufficient to charge the purchaser with notice of potential breach of fiduciary obligation but . . . knowledge that the proceeds are being applied to the personal indebtedness of the fiduciary will charge the purchaser with such notice."
 
 
 40
 (emphasis added).
 
 
 41
 At trial, plaintiff bank acknowledged that it was fully aware that Emerson was president and major stockholder in Ruson Laboratories. The bank also knew that Emerson was in a fiduciary relationship with Mrs. Sefton. As recognized by the above authorities, knowledge of the mere existence of this relationship does not charge the purchaser with notice so as to disqualify it from becoming a bona fide purchaser. Neither does the fact that the security is transferred to the individual account of the fiduciary, by itself, constitute notice. But here, the plaintiff bank knew that the transaction was for the individual benefit of Emerson. True, the loan was made to Ruson Laboratories and not to Emerson personally. But Emerson was the controlling stockholder in Ruson. To suggest that the loan did not benefit him personally would be an unduly narrow and restrictive interpretation of the Oregon statute (78.3040(2)). The purpose of the statute is to forbid the purchaser from claiming the protection of a bona fide purchaser when it has knowledge that the transaction is for the individual (personal) benefit of the fiduciary. Here, the bank had this knowledge. Accordingly, the plaintiff bank "is charged with notice of adverse claims," Ore.Rev.Stat. § 78.3040(2). See State Bank of Binghampton v. Bache, 162 Misc. 128, 293 N.Y.S. 667 (1937).
 
 
 42
 We therefore affirm the judgment of the District Judge. Plaintiff bank is not entitled to relief.
 
 
 43
 AFFIRMED.
 
 
 
 [1]
 Losses by Ruson, by year:
 1958 ($37,506.45); 1959 ($47,873.49); 1960 ($9,024.54); 1961 ($4,482.42); 1962 ($256,483.04); 1963 ($33,892.98); 1964 ($43,749.30); 1965 ($12,895.38); 1966 ($35,152.12); 1967 ($136,538.96).