**INC. PUBLISHING CORPORATION, Goldhirsh Group, Inc., and Bernard A. Goldhirsh, Plaintiffs,**

v.

**MANHATTAN MAGAZINE, INC., Metrocorp, and D. Herbert Lipson, Defendants.**

No. 84 Civ. 6882–CSH.

United States District Court, S.D. New York.

Aug. 2, 1985.

Berle, Kass & Case, New York City (Peter A.A. Berle, Michael B. Gerrard, New York City, of counsel), for plaintiffs.

Dechert Price & Rhoads, New York City, Dechert Price & Rhoads, Philadelphia, Pa. (Robert C. Heim, John M. Coleman and Judy L. Popper, Philadelphia, Pa., of counsel), for defendants.

**372**

## MEMORANDUM OPINION
## AND ORDER

HAIGHT, District Judge:

Plaintiffs bring this action for statutory and common law trademark infringement arising from the use of allegedly similar magazine titles. They seek an injunction and an accounting. Subject matter jurisdiction is based on 28 U.S.C. §§ 1338 and 1332. Venue lies under § 1391(b). Plaintiff's motion for a preliminary injunction was consolidated with trial on the merits. Rule 65(a)(2), F.R.Civ.P. The Court denied a preliminary injunction.[1] The plenary bench trial of the action for permanent injunction and an accounting has been concluded. What follows constitutes the Court's findings of fact and conclusions of law. Rule 52(a).

### I.

### Plaintiffs' Publications

Plaintiffs own and publish the magazine "Inc.," a monthly publication, distributed nationwide. Plaintiff Bernard A. Goldhirsh controls the corporate plaintiffs. Their main offices are in Boston. Offices are also maintained in Manhattan and elsewhere.

After a planning and formulation period in 1977–1978, "Inc." first appeared in April 1979, and monthly thereafter. Its logo consists of the word "Inc.," set in upper and lower case, hand-lettered Times Roman serif type, in the upper left-hand corner of the cover, accompanied by the descriptive phrase set in smaller type, all capitals: "THE MAGAZINE FOR GROWING COMPANIES."

Plaintiffs furnished a further description of "Inc." 's editorial content in a trade publication called "Standard Rates & Data" ("SRD"). SRD groups magazines into various categories; and, as to each magazine, prints a "publisher's editorial profile" which the magazine's executives draft. The profile is intended to state succinctly what the magazine is about. SRD then prints circulation figures and advertising rates. Advertisers and their agencies use SRD as an important reference. "Inc." is listed under magazines dealing with "Business & Finance." The "publisher's editorial profile for "Inc." contained in the May 27, 1985 issue of SRD reads as follows:

"INC. is for executives who run small to midsized companies. Its purpose is to provide them with specific, practical answers to both their immediate and long-term management problems. Through in-depth studies, Inc. demonstrates how other entrepreneurs have dealt with major business decisions, and offers the reader guidelines for solving his own. Its departments stress the how-to aspects of Financial Management, Personnel Management, Marketing, Sales, Administration and Operations. Inc. also covers and analyzes news pertinent to smaller company management, including trends, economic forecasts and legislation that affect them."

"Inc." prospered. Certain of plaintiffs' witnesses almost went so far as to suggest that this is the greatest publishing success story since the invention of the printing press. Even allowing for partisan enthusiasm, it is clear that "Inc." has been highly successful. From a standing start in early 1979, in January 1985 the magazine had achieved a guaranteed paid circulation of 600,000. Goldhirsh testified, and I accept, that present paid circulation (including subscription and newsstand sales) is 640,000 to 650,000 copies. "Inc." 's total revenues for 1983 (the last year for which complete figures are available) were about $33,600,000. That represents a growth from 1982 to 1983 of 58 percent. An expert witness for plaintiffs, whose evidence I accept, estimated "Inc." 's total revenues for 1984 at about $50,000,000.

"Inc." is distributed nationwide. There is no regional difference in its editorial content. Advertisements differ, to some degree, on a regional basis.

1. The Court's oral decision denying a preliminary injunction appears at Tr. 515–518.

On September 7, 1982 plaintiffs registered the trademark "Inc." with the United States Patent and Trademark Office, Reg. No. 1,207,153. The registration was issued for "business magazine, in Class 16 (U.S. Cl. 38)."

## II.

### Defendants' Publication

Defendants own and publish the magazine "Manhattan, Inc.," a monthly publication, distributed in the tri-state, greater New York metropolitan area. Defendant D. Herbert Lipson controls the corporate defendants, whose main offices are in Manhattan.

Lipson is the sole shareholder of defendant Metrocorp, which in turn owns three magazines: "Philadelphia Magazine," "Boston Magazine," and (most recently) "Manhattan, inc." "Philadelphia Magazine" was started in 1908. Lipson became its publisher in 1961. He acquired "Boston Magazine" from the Boston Chamber of Commerce in 1971. These two publications are known to the trade as "city magazines." They are distributed regionally, and cover a broad range of general interest subjects in their particular urban areas: politics, fashion, restaurant and theater reviews, and the like.

In early 1983, Lipson and his colleagues focused on a magazine for the New York City market. A "typical city magazine" was rejected because of the successful presence of New York Magazine. Finally Lipson decided on "a business magazine," but "somewhat different"; they developed "the concept of a hybrid magazine which is a cross between People and Forbes, a little bit of Ms. ... We wouldn't write articles about companies. We would just focus on the people and personalities, the players in this arena of Manhattan"; the concept narrowed down "just to cover the people who worked on this island."[2]

The first issue of "Manhattan, inc." appeared in September 1984. The magazine's logo is set in hand-lettered Caslon serif type. The words "Manhattan, inc." (the "i" in "inc." is lower case) appear in a colored and bordered box at the top of the cover which runs its full width. Above the title there appears in smaller type, upper and lower case:

"The Business of New York."

The "publisher's editorial profile" in SRD describes the magazine as follows:

"MANHATTAN, INC. is a feature business magazine for and about the people who dominate the world's most competitive marketplace. It is about economic, political, social and cultural power. The editorial concentrates on Manhattan-based businesses, with features on Wall Street deals, lucrative real estate transactions, advertising, publishing, law, banking, retailing and entertainment. The magazine also includes advice on the high points of working and winning in Manhattan, such as office essentials, discreet business lunch spots and the top cultural events."

"Manhattan, inc." is off to a good start. The present circulation is about 50,000. An increasing number of impressive ads appear. No detailed financial figures are in evidence, and it may well be that the magazine is not yet showing a profit. But it is clear that, in the high risk, low survival world of magazine publishing, the launching of "Manhattan, inc." gives considerable promise.

## III.

### Pre-Litigation Dialogue Between the Parties

I will now consider certain transactions and communications between the parties during the period prior to filing of suit.

One marketing stratagem used in starting a new magazine is direct, pre-publication mailings to prospective subscribers. This occurs when the magazine has not yet seen the light of day. It is only a gleam in its publisher's eye, reinforced by dummy layouts and other tentative projections.

---

**2.** Lipson, Tr. 540–41.

The early mailings seek to attract "charter subscribers"—individuals who can be persuaded by promotional material to subscribe, usually at discount rates.

To cull from the metropolitan area's teeming millions a likely group of addressees for this purpose, magazine publishers employ the services of list brokers. Every magazine has a list of its current subscribers. Publishers rent or sell their lists to other publishers, and rent or buy others' lists. The list brokers stand at the middle of such transactions. They also act as "list managers" of their publisher-clients' lists. The practice is rampant, although the general public may not be aware of it. It explains, for example, why, if you subscribe to one investment advisory service, you begin to hear from 34 other services.

Publishers exercise control over their lists. Generally, they do not want them to be used by direct competitors. The more fastidious publishers do not wish tasteless mailings sent to their subscribers. Accordingly industry custom and practice require a list broker to send the proposed mailing to the list owner and obtain the latter's approval before selling or renting all or part of the owner's list to another publisher.

To ensure compliance with these restrictions, publishers commonly "salt" or "seed" their lists. This involves sprinkling through the subscription list names and addresses of the publisher's executives, employees, or surrogates. The purpose is to run a check on the entities to whom the broker is distributing the list. As the case at bar shows, this safety system works.

Plaintiffs' list broker is American List Council. Plaintiffs dealt with its president, Liza Price. Defendants' list broker is the Kleid Company. The account executive in charge of defendants' account is Maryann Mallardi.

In late 1983, the staff at "Manhattan, inc." was engaged in preparing a direct mailing to solicit charter subscribers. They rented lists or portions of lists from a number of magazine publishers. One of these was "Inc." In early December 1983, Mallardi forwarded an order to Price for 5,000 names from the "Inc." mailing list. At that time, the tentative name for the new venture was not "Manhattan, inc." but rather "Manhattan Magazine." Price responded to Mallardi's order by sending to the publishers of "Inc." in Boston a copy of the intended mail piece and a request for clearance. The test mailing was scheduled for the week of January 23, 1984. "Inc." granted the clearance.

In mid-February, 1984, Mallardi telephoned Price to advise that the new magazine's title had been changed to "Manhattan, inc.," and that the mailing had been postponed to the week of March 5, 1984. Price asked Mallardi to confirm that advice in writing. Mallardi did so under date of February 16, 1984. Price did not fully take in the change in name. She did not advise the "Inc." executives of these changes. She simply approved them, and permitted the order to be implemented. At trial Price, in a heartfelt and unquestionably sincere *mea culpa*, charged herself with negligence *vis-a-vis* the plaintiffs, her publishing clients.

The parties debate the significance of the list brokers' testimony at length. Defendants suggest that, in fact, Price passed on to plaintiffs the February name change when she learned of it. I find to the contrary; but in the view I take of the case, it makes no difference. Alternatively, defendants argue that Price should be regarded as plaintiffs' agent, so that notice to Price of defendants' intended name constitutes notice to plaintiffs, as Price's principal. Plaintiffs respond that the argument runs counter to the law of agency.

I need not resolve these issues. It is in any event acknowledged by plaintiffs that, not later than in early April 1984, an employee of plaintiffs "received a description promotion piece in the mail from Manhattan, inc."[3] The logical inference, which I draw, is that plaintiffs' unnamed employee received this mailing because his name con-

---

**3.** Plaintiffs' answer to defendants' interrogatory No. 1.

stituted one of the grains of salt which plaintiffs had shaken over their mailing list, in the manner and for the purpose described *supra.*

Thus in early April 1984, plaintiffs knew that defendants were planning a new magazine; what the nature of that magazine would be; and that defendants proposed to call it "Manhattan, inc."

Goldhirsh is strenuously opposed to defendants' use of this title. The reasons for his objections I consider *infra.* For the present purpose of chronology, it is sufficient to say that Goldhirsh asked his attorneys in Boston, the firm of Hill & Barlow, to "please correspond with the folks at Manhattan, inc. and ask them not to use the Inc. name in their magazine."[4] But Hill & Barlow could not act for plaintiffs, because they represented Lipson's interests in Boston. Hill & Barlow recommended Goldhirsh to plaintiffs' present counsel in New York. Goldhirsh directed counsel to correspond with Lipson. That direction resulted in a letter dated July 23, 1984 from counsel to "Manhattan, inc."'s New York office, directed to Lipson's attorney. The full text appears in the margin.[5] Plaintiffs' counsel characterized as "an especially great danger that many present or potential readers and advertisers may take 'Manhattan, inc.' to be a regional edition of 'Inc.'." As we shall see, this is a particular

concern felt by plaintiffs underlying this lawsuit.

Counsel's letter of July 23, 1984 led to a trip by Goldhirsh to New York on August 14, 1984 to confer with Lipson. That conversation was inconclusive. The participants differ as to certain details. I need not resolve those differences. It is common ground that Goldhirsh asked Lipson to abandon the "Manhattan, inc." title, and said he would sue for trademark infringement if Lipson declined to do so. Lipson responded that he would think it over and get back to Goldhirsh. Some days thereafter, Lipson telephoned Goldhirsh to advise that he would not abandon the title. The complaint in this action was filed on September 24, 1984. After discovery, plaintiffs moved for a preliminary injunction on May 30, 1985.

## IV.

### *Plaintiffs' Claims of Infringement*

Plaintiffs claim that defendants' use of the word "inc." following "Manhattan" in their magazine title infringes plaintiffs' registered trademark "Inc." as the title of plaintiffs' magazine.

Goldhirsh described his apprehensions as follows:

"Well, the impact is a disaster in that (1) it makes it very difficult for us to do a

---

**4.** Tr. 27.

**5.** The letter, PX 7 at trial, is on the letterhead of Berle, Butzel, Kass & Case, and reads:

July 23, 1984

BY HAND
Manhattan, inc.
420 Lexington Avenue
New York, New York 10017
Attn: Mr. D. Herbert Lipson, Publisher
 Re: *Trademark Infringement*
Dear Mr. Lipson:
 We are counsel to Goldhirsh Group, Inc., and its subsidiary, Inc. Publishing Corporation, which publishes *Inc.* magazine. Our clients hold the registered trademark for the "Inc." title.
 It has come to our attention that you have announced a plan to introduce a magazine called "Manhattan, inc.". This letter is to advise you formally that we would regard your use of this title as a violation of our client's trademark.

We believe that, under the circumstances, such a use creates a substantial likelihood of confusion, mistake or deception. This is particularly so since, from what we have been able to surmise, your magazine may contemplate an editorial content, a target audience, and a marketing and distribution plan similar in many respects to those of our clients. There is an especially great danger that many present or potential readers and advertisers may take "Manhattan, inc." to be a regional edition of "Inc.".
 We hereby demand that you immediately cease and desist any and all preparations to put out a magazine with the name "Manhattan, inc." or any other name that infringes on the "Inc." trademark. Your failure to do so will compel us to take all such further actions as may be necessary to protect the rights of our clients.
 Sincerely,
 s/ Peter A.A. Berle
 Peter A.A. Berle

regional edition in New York City; it possibly sets a precedent where other Inc.'s can appear around the country, all of which just continues to dilute the name. It is a disaster in terms of our goal to build circulation because a person sees Manhattan, inc. on the newsstand and thinks it might be a regional edition of Inc. magazine."

\* \* \* \* \* \*

"Well, I have concerns about newsstand sales; I have concerns about direct-mail sales when we mail to attract a subscriber; to a subscriber for any number of reasons may have seen Manhattan, inc. and not liked it and thinks that when he gets the Inc. mailing that he won't subscribe to Inc. because he saw Manhattan, inc. and he didn't like that. Or, the person already gets Manhattan, inc. and thinks he already gets, Inc. I mean, there are so many ways that the subscriber can be confused.

"The advertisers may think it is a regional edition of Inc. magazine. The advertising rates depend on our circulation success. And as I said, our goal has been to get to the level of Fortune, Forbes and Business Week so that we can compete with them. Anything that—anything that hurts us from getting there makes our advertising sales job much more difficult."

Tr. 36–38.

Thus plaintiffs claim the likelihood of future confusion, dilution of their trademark, and economic loss.

Although eleven issues of "Manhattan, inc." have appeared to date, there has been no discernible effect upon "Inc."'s circulation and total revenues, which as noted *supra,* continue to soar. Plaintiffs' main concern appears to be the adverse effect that a magazine like "Manhattan, inc." would have upon plaintiffs' intentions—not yet implemented—to publish regional editions of "Inc." with different editorial content. Goldhirsh testified that he began thinking about such a project "very early on," and conversed with his editors about it

"as early as 1981–1982 period"; presently, Goldhirsh continued:

"The plans remain alive, but our goal was to build the magazine nationally and then—our goal was to get into the circulation level of Fortune and Forbes and Business Week, which we've just done this year, getting up to 650,000 circulation."

Tr. 35.

## V.

### *Validity of the Mark*

It is common ground that, as between the parties to this litigation, plaintiffs were the first users of the mark "Inc." as the title (or part of the title) of a magazine.

■ A magazine title may give rise to a protectable trademark. The Second Circuit so held recently in *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14 (2d Cir.1985). Plaintiff published a magazine called "CLASS." Defendant argued that the mark "CLASS" was merely descriptive and therefore not protectable. District Judge MacMahon, writing for the Court of Appeals, rejected that argument. He stated generally:

"A protectable trademark is established when the mark is adopted and used to identify a product. A generic mark or a descriptive mark which has no secondary meaning cannot be a valid trademark." 753 F.2d at 16.

But the Court found the magazine title "CLASS" to be suggestive, not generic or merely descriptive. The Second Circuit's opinion continues:

"It is clear, however, that Class Promotions had adopted and used the mark "CLASS" as the title of its magazine. The mark is not descriptive of the publisher's product, magazines, or of any specific product offered for sale. Instead, the mark is suggestive because 'it requires imagination, thought and perception to reach a conclusion as to the nature of [its] goods.'"

*Id.* at 17, citing and quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.,*

537 F.2d 4, 11 (2d Cir.1976) (footnote omitted).

■ The Second Circuit concluded that the word "Class," used as the title of a magazine, "is a suggestive mark and thus a valid trademark without proof of secondary meaning." *Ibid.* I reach the same conclusion with respect to plaintiffs' use of the word "Inc." as the title of their magazine.

## VI.

### Infringement of the Mark

Having held (as I have just held in the case at bar) that the plaintiffs' magazine title in *C.L.A.S.S. Promotions, Inc., supra,* constituted a valid trademark, the Second Circuit went on to say:

"Given a valid trademark, the critical issue in an action for trademark infringement is whether there is any likelihood that an appreciable number of reasonable consumers would be misled, or simply confused, as to the source of the goods in question."

*Id.* at 17.

"Likelihood of confusion" has been further defined by the Third Circuit in *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 (3rd Cir.1978):

"Likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark."

"Likelihood of confusion" is the particular target of the governing federal statute, the Lanham Trade-Mark Act, which "protects against false designations of origin and false description or representation, whether or not a registered trademark is involved." *Thompson Medical Company, Inc. v. Pfizer Inc.,* 753 F.2d 208, 212 (2d Cir.1985) (footnote omitted). In the case at bar, plaintiffs registered their mark. Accordingly sections 32(1) and 43(a) of the Act, 15 U.S.C. §§ 1114(1), 1125(a) (1982), are implicated. Their relevant provisions appear in the margin.[6]

The "consumers" of magazines are advertisers; readers by subscription; and readers who purchase single copies at newsstands. The question therefore becomes whether such consumers, advertising in, subscribing to, or purchasing single copies of "Manhattan, inc." would be "misled, or simply confused," or "would probably assume," that plaintiffs published "Manhattan, inc."

We are reminded by the Second Circuit in *C.L.A.S.S. Promotions, Inc., supra,* that

**6.** Section 32(1) of the Lanham Act provides in part:

"Any person who shall, without the consent of the registrant—

"(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

"(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

"shall be liable in a civil action by the registrant for the remedies hereinafter provided."

Section 43(a) provides:

"Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

the district court, "in making this determination and fashioning equitable relief, must look not merely to the similarity of the conflicting marks but to a number of other factors." *Id.* at 17. Those other factors have come to be known as the *"Polaroid* formula," in tribute to Judge Friendly's opinion in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Judge Friendly there wrote:

> "Where the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account."

Cases subsequent to *Polaroid* make it clear that the *"Polaroid* formula" properly extends to competing products as well as different or non-competing ones, *Thompson Medical Co., Inc. v. Pfizer Inc., supra,* 753 F.2d at 214 and cases there cited; and that, as the *Polaroid* decision itself recognized, other variables besides those therein enumerated may have to be considered. These include a more general balancing of "the conflicting interests of the parties involved," *McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1140 (2d Cir.1979); and such equitable factors as "the nature of the senior user's priority, the senior user's delay in asserting its claim, and the harm to the junior user as compared to the benefit to the senior user that would result from the requested injunction." *Thompson Medical Co., Inc. v. Pfizer Inc., supra,* at 214, citing *Chandon Champagne Corp. v. San Marino Wine Corp.,* 335 F.2d 531, 536 (2d Cir.1964).

In *Thompson Medical Co., Inc. v. Pfizer Inc.,* Judge Kaufman described the essence of the "likelihood of confusion" test, and the responsibility falling upon the district court in its implementation:

> "The wisdom of the likelihood of confusion test lies in its recognition that each trademark infringement case presents its own unique set of facts. Indeed, the complexities attendant to an accurate assessment of likelihood of confusion require that the entire panoply of elements constituting the relevant factual landscape be comprehensively examined. No single *Polaroid* factor is pre-eminent, nor can the presence or absence of one without analysis of the others, determine the outcome of an infringement suit." 753 F.2d at 214.

To that examination, hopefully comprehensive, I now devote myself.

### 1. *Strength of the Mark*

■ The capability of the word "Inc." to function as a trademark does not determine its relative strength. *C.L.A.S.S. Promotions, Inc., supra,* 753 F.2d at 17. As there pointed out, the strength of a mark "refers to its distinctiveness, 'or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, possibly anonymous, source.'" (quoting and citing *McGregor-Doniger, Inc. v. Drizzle Inc., supra,* 559 F.2d at 1131).

■ As previously observed, suggestive marks are protectable without proof of secondary meaning. However, the absence of evidence of secondary meaning may be considered as a factor weighing against a finding of a likelihood of confusion. *Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960, 968 (2d Cir.1981).

Defendants argue that "Inc." is a weak mark because it has been used generically "in American English in combination with other words" (brief at 19). That is true enough, and it has been going on for some time: the "Mafia" of today was the "Murder, Inc." of earlier decades. Other more contemporary examples abound. But the case at bar turns not upon such prior usage in different contexts, but upon the strength

of the mark "Inc." as the title of a magazine.

■ In evaluating the strength of a mark as a magazine title, the Court may consider the length of time the magazine has been in circulation; the size of its circulation; the breadth of its geographical scope; and evidence tending to show that the mark "is associated in the public's mind with the magazine ... *or* with its publisher," *C.L.A.S.S. Promotions, Inc.*, *supra*, at 17–18 (emphasis added).

■ Judged by these criteria, "Inc." is a relatively strong mark. In the six years of its publication, the magazine has built up to a circulation rivaling that of the most successful business publications. The magazine is distributed nationwide. Defendants state correctly that only part of that distribution is in the New York area; but in the inbred worlds of business, business advertising and publishing, national distribution leads to regional recognition. The unusually successful nature of this publishing venture has generated a great deal of favorable comment in the trade and general press. The record is replete with examples. To be sure, much of that comment was inspired by the publisher's own energetic public relations department, but no matter; what counts in this area is familiarity, whatever the source. The evidence also shows that, within the competitive context of magazine advertising, "Inc." is well known as a business magazine, and a creation of Mr. Goldhirsh's publishing empire. The identity of the publisher may not be as well known to the subscribing or newsstand reader as to the advertising community; but advertising is crucial to a magazine's fortunes. Viewing advertisers and their agencies as highly significant "consumers" of magazines, "Inc." has become well known both as a magazine and as a Goldhirsh magazine. Even as to the subscription and newsstand readers, while they may not be as aware of the publisher's identity, the evidence is abundant that in the reading public's mind, the mark "Inc." is associated with plaintiffs' magazine. *C.L.A.S.S. Promotions, Inc.*, *supra*, speaks in the disjunctive on this issue of association in the public mind. I conclude that "Inc." is a relatively strong mark.[7]

## 2. *Similarity of Marks*

As to the alleged similarity of the marks, plaintiffs focus upon defendants' use of the word "inc." in the title of their magazine. That is an understandable emphasis, since plaintiffs' prior, registered use is limited to the word "Inc."

■ However, it is clear from the law of this Circuit that I must not restrict my gaze to the appearance of these two words in the parties' logos. "In order to determine if confusion is likely, each trademark must be compared in its entirety; juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar." *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 117 (2d Cir.1984); see also, *Thompson Medical Co., Inc. v. Pfizer Inc.*, *supra*, at 218 and cases there cited.

In the case at bar, plaintiffs' logo "Inc." appears in the upper left-hand corner of the magazine's cover. (See copy which appears as Appendix A to this opinion.) The logo also contains the phrase above the word "Inc.," printed in smaller type (albeit all capitals): "THE MAGAZINE FOR GROWING COMPANIES." The "entirety" of plaintiffs' trademark consists of all these words, together with their placement on the cover.

The word "inc." in defendants' logo comes after the much longer word "Manhattan," the first letter of which is capitalized. On the cover of the magazine, a copy of which appears as Appendix B, these words are contained within a colored, bor-

---

7. I use the qualifier "relatively" because the word "Inc." does have, as defendants observe, so many other usages and connotations. As a magazine title, a word like "playboy" is a stronger mark, with its markedly narrower evocation of "the aspirations, if not the life-style, of certain men," *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. 414, 420 (S.D. N.Y.1980), *aff'd*, 687 F.2d 563 (2d Cir.1982).

dered box which runs the full width of the cover. The box also contains, in smaller type, centered above the title "Manhattan, inc.," the descriptive phrase: "The Business of New York."

The logo types are, to the layman's eye, similar, although the evidence indicates that the typefaces are different: "Manhattan, inc." is Times Roman, "Inc." is Caslon. However, the additional word "Manhattan" in defendants' mark serves, in my judgment, substantially to reduce the potential for confusion.

That is because "Manhattan," the first, longest, and only capitalized word in the mark, exercises a visual dominance over the trailing, lower-case "inc." Not surprisingly, the "principal concern" of Walter Bernard, the graphic designer of "Manhattan, inc."'s logo, "was that there was a magazine named 'Manhattan.'" Tr. 706.[8]

Plaintiffs say that defendants' behavior is as outrageous as would be a competing magazine entitled "Manhattan Playboy" or "Manhattan Good Housekeeping." There are two problems with the analogies. First, "playboy" and "good housekeeping" as magazine titles are stronger marks. See fn. 7, *supra*. Second, the analogies implicitly assume a close proximity of editorial content. That is not the case as between "Inc." and "Manhattan, inc.," as demonstrated in the discussion immediately following.

**8.** "Manhattan" magazine is a quarterly publication of Bard Communications Inc. According to its publisher's editorial profile in SRD, the magazine "celebrates the elegance and excitement of the city—from elect private parties and nightspots to individuals of talent and style."

**9.** I had occasion to comment on this newsstand practice in *Blake Publishing Corp. v. O'Quinn Studios, Inc.,* 202 USPQ 848, 855 (S.D.N.Y.1979), a trademark infringement suit which also involved two magazines.

"Comparison of the two logos reveals the following: both occupy the upper quarter of their respective covers, running on a single line from left to right; both are printed in yellow block lettering; 'Fantastic Films' uses diminishing lettering, i.e. it is largest in the upper-left corner and gradually diminishes as it reaches the right corner; the 'Fantastica'

There are also differing presentations of the two logos which reduce the confusion potential. By "differing presentations," I refer to two factors. The first relates to the descriptive phrases which appear on the covers. Plaintiffs' phrase "The Magazine for Growing Companies" conveys a significantly different message from defendants' phrase "The Business of New York." Indeed, it is a difference which, as we shall see *infra,* accurately reflects the significantly different editorial content of the two magazines. "The Magazine for Growing Companies" defines "Inc." as intended (as specifically stated in its SRD profile) for a nationwide audience of relatively small or mid-sized companies that are growing, or wish to do so. Defendants' phrase "The Business of New York" suggests an appeal to "business" of unspecified size, but based upon "New York," which probably means *big* business.

A second significant difference in presentation relates to plaintiffs' title being confined to the upper left-hand corner of the cover, while defendants' title stretches across the width of the magazine. That becomes significant when one considers the manner in which magazines are frequently (although not always, see photographs PX 16 and PX 17) displayed on newsstands. Frequently newsstands display magazines in a stacked, overlapping fashion which exposes only the left-hand portion of the cover and the titled binding.[9] When this form

lettering remains the same size from left to right.
"Kerry O'Quinn testified that the upper-left corner is 'the most important real estate on a magazine cover' (Tr. at 332), primarily due to the way newsstand magazines are displayed: 'It is—that's the case with virtually all newsstand magazines and it has to do with the fact the way the magazines on many newsstands are stacked. They are stacked so that the left-hand portion of the magazines sticks out. That's the way you identify it and hopefully someone will see a word that will catch their attention and will pull the magazine out and examine it in greater detail.' (Tr. at 317). Richard Browne corroborated that magazine covers are laid out so as to call consumer attention to the bound left-hand side. (Tr. at 226)."
In *Blake* that method of display increased the likelihood of confusion between two magazines

of display is utilized, plaintiffs' mark "Inc." would catch the potential reader's eye, but the trailing "inc." in defendants' mark would be obscured. It is impossible to quantify with precision the number of greater metropolitan area newsstands which utilize such displays; but I may under Rule 201(b)(1), F.R.Evid., take judicial notice of its frequent occurrence, with a consequent lessening in the likelihood of confusion between these two magazines.

### 3. *Product Proximity*

■ In considering the "product proximity" of magazines, pertinent considerations include "differences in appearance, size, content, geographical distribution, and audience appeal," *C.L.A.S.S. Promotions, supra,* at 18.

Predictably, plaintiffs contend that these differences are minimal, and defendants portray them as vast. Neither extreme is justified by the evidence; but the evidence does reflect significant differences between the two magazines in certain of these respects.

The magazines are the same size. Both appear monthly. Both deal in a general sense with the world of "business"; at least "Manhattan, inc." does so in part. Both appeal to a sophisticated readership. The demographic studies in evidence show that readers of both magazines tend to be well educated, affluent, and commercially successful. The parties contend for shadings of difference, but the demographics show more similarities than differences. Both magazines attract upscale advertisers. "Inc." sells for $3.00 at the newsstands, and "Manhattan, inc." for $2.95.

Having said all that, there is also a discernible difference between the manners in which the two magazines have "positioned"

themselves. "Positioning" is a concept which, in the words of a plaintiffs' witness, "consists of trying to find an open hole, or slot, in the mind and then become the first company or brand or product to fill that open hole or slot." [10] Positioning is thus a function of that ageless law of supply and demand, the publisher's first step being identification of a demand for a new magazine, and his second the furnishing of the supply. The "editorial profiles" of the two magazines appearing in SRD, quoted *supra,* accurately reflect their publishers' perceptions of the magazines' respective positionings.[11] The first sentence of each profile undertakes to describe who the magazine is "for." "Inc." 's profile begins: "Inc. is for executives who run small to mid-sized companies." "Manhattan, inc." 's profile begins: "Manhattan, inc. is a feature business magazine for and about the people who dominate the world's most competitive marketplace." There are manifest differences in these audiences. The executive who runs a "small to mid-sized" company in, say, Indiana, may aspire one day to become one of those people "who dominate the world's most competitive marketplace," or he may not; but even if he does, he is not there yet. We are talking about persons at different stages of their development (if "development" is the right word for it; those not entranced by New York would suggest another).

The summary descriptions in the profiles find fuller expression in the contents of the magazines, which are in turn reflected by their covers. Again acknowledging that there are points of similarity, there are also significant differences. A complete index of those differences would unduly extend this opinion. I shall therefore content myself with an illustrative analysis of the first of "Manhattan, inc." 's eleven issues and

titled respectively "Fantastic Films" and "Fantastica." In the case at bar, the effect upon likelihood of confusion is the opposite, for the reasons stated in text.

**10.** Ries, Tr. 178–79.

**11.** At trial Goldhirsh sought to distance himself from the "publishers editorial profile" of "Inc."

appearing in SRD by stating that it was "placed by the advertising sales manager," adding: "I can't speak for him." Tr. 46. I am not particularly impressed by this disclaimer, particularly since Goldhirsh, although criticizing the profile as "incomplete" during deposition testimony in January 1985, has done nothing to amplify or correct it since then. *Id.* at 46–47.

its "Inc." counterpart; of the two current issues; of a third pairing of issues chosen at random from between these two poles; and an analysis of all eleven competing covers.

### (a) The September 1984 Issues

The first issue of "Manhattan, inc.," true to its appeal to dominance, has as its cover an artistic rendering of John Reed perched in a dominating pose upon the top of the Citicorp building, Reed having recently won the competition for chairman of that imposing financial structure.

The introductory letter of editor Jane Amsterdam to "Volume 1, Number 1" expresses the hope that "Manhattan, inc." "will reflect the energy and ambitions of the people it was designed to cover." She summarizes, in a breezy style characteristic of the magazine, the contents of the first issue:

"In this, our premiere issue, we have chosen to profile an eclectic and colorful cross section of executives. Our stories are about success (Citicorp's new chairman John Reed) and succession (Value Line's 82½-year-old founder, Arnold Bernhard, and his daughter Jean Buttner); co-ops (the billion dollar bonanza planned in the outer boroughs) and cooperation (the extraordinary staff of the Oyster Bar); real estate (superbroker Alice Mason) and the fourth estate (CBS' war of words with William Westmoreland); headhunter (Gerry Roche) and headache (NBC's disastrous 1983 season); Freudian slips (Mary Cunningham's) and pink slips (Merrill Lynch's)."

Summarizing the original concept of publisher Lipson, editor Amsterdam continues:

Our readers and subjects were to be one and the same—Manhattan-based men and women who operate on a grand scale, sophisticated achievers whose actions are worth watching and weighing." September 1984 issue at 6.

The cover of "Inc." for September 1984 is comprised of a photograph of an unnamed male, gazing upwards at a carrot suspended from a string. The title of the cover article is "The Take At The Top," whose text (at 44) is introduced by this descriptive paragraph:

"How growing companies manage the care and feeding of their key executives."

The other featured articles in that issue of "Inc." include the use that baseball manager Davey Johnson of the New York Mets makes of his computer; an article entitled "Growing Steady," which argues that "maybe it's how well you grow that matters, not how fast"; an article entitled "Fear of Capitalism," an argument in favor of "entrepreneurism"; a discussion of Hardee's Food Systems, Inc. of Rocky Mount, North Carolina, the fourth-largest hamburger concept franchiser in the nation; and various articles which may fairly be characterized as "how-to" advice useful to growing companies.

The September 1984 issue of "Inc." also contains an introductory statement (captioned "FYI") by its editor, George Gendron. Gendron describes a recent trip to Tokyo, where he helped "celebrate the launching of ASPECT, a monthly magazine aimed at Japan's entrepreneurial culture and published in collaboration with INC. here at home." Gendron quotes the executive vice-president of the new Japanese publication as describing what he is attempting to avoid:

" 'But the people who have real influence in the world of finance are the older people, and most of the business magazines are also influenced by these older people. They do not understand *hara-gei*. And anyone starting a new magazine has copied what they've done, because that was the way to achieve success. They end up writing about the steel companies and the car companies, not smaller venture businesses like us.' "

Gendron, giving clear voice to the concept of "positioning," then says of the magazine he edits:

"It was this same sort of void in American business publishing, of course, that inspired INC.'s maiden editorial voyage some five and a half years ago."

September 1984 issue at 7.

## (b) *The July 1985 Issues*

"Manhattan, inc." 's current issue has a cartoon cover of Nelson Doubleday, the owner of the prominent, privately-held New York corporation that bears his family's name. The cover article, titled "Bleak House," deals in detail with recent reversals and dislocations encountered by the company's publishing division. Other feature articles focus upon the Manhattan wine merchant Peter Morrell, and his challenge to the influential Sherry-Lehmann wine store; Kenneth D. Laub, a Manhattan real estate broker whose company has made more than $10 billion worth of deals over the past sixteen years; marketing problems and strategies of young, upwardly mobile New Yorkers awaiting their first baby, with an emphasis upon what it costs to raise a fashionable urban child these days; and Mira J. Sheerin, who makes a living as a professional fund raiser and organizer of much publicized, money-raising charitable events in the city.

The July 1985 issue of "Inc." has, as the caption for its cover, the phrase "The Spirit of Independence." This is a special issue, with brief articles or statements from a large group of individuals running the gamut from President Reagan through William Winpisinger to Gale Sayers, by way of T. Boone Pickens. This collection is introduced by the following statement, opposite the table of contents:

> "Something remarkable is happening in America. An entrepreneurial renaissance is under way, the likes of which we have not seen in 60 years. All across the country, people are starting companies at a record-breaking pace. But the statistics tell only part of the story. Who are the men and women launching these companies? How are they changing the world of business? Where are they going? Who is being left behind?
>
> "This spring, INC. senior editor Curtis Hartman traveled around the United States, tape recorder in hand, talking to the people who are reshaping the American economy, and who are being reshaped by it. His goal was not to tell their story, but to let them tell it, in their own voices and words."

July 1985 issue at 3.

## (c) *The November 1984 Issues*

The November 1984 issue of "Manhattan, inc." features a cover photograph of prominent Manhattan attorney Roy Cohn. The cover article is entitled "Roy Cohn at le Cirque: All Power, No Lunch." The article is built around a distinctly informal interview with this well-known figure, described by author Ron Rosenbaum (at 57) as "a power broker respected and feared by the Big Boys." Other featured articles include an account of the current battle for control of Walt Disney Productions; a discussion of the current status and problems of Lisa Birnbach, "Rich, Famous and Eminently Marketable," who either wrote or did not write the phenomenal best-seller "Preppy Handbook"; the Manhattan-based personal best cosmetic surgery operation, of whose proprietor, Richard L. Dombroff, M.D., it is said (p. 85): "In two short years, he has expanded his Manhattan practice so much that he claims to be performing more operations than any other such practice in the city—and perhaps in the country at large"; and an article entitled "Henry Kissinger, Inc." which inquires into what Dr. Kissinger and associates are "selling—and earning—these days."

The November 1984 issue of "Inc." has as its cover article an account of David Houck, a former supervisor with one of the major steel companies, who as president of the three-year-old McDonald Steel Corp. has brought some steel industry jobs back to Youngstown, Ohio. Houck and his associates leased from U.S. Steel Company the most successful of a number of Youngstown mills that "big steel" had shut down. Houck's philosophy is stated at page 54 of the article:

> "The vision of a revitalized Youngstown that is emerging from the work of people like Houck and his backers rests on a

hundred small ventures taking the economic place of every silent giant.

" 'What we're talking about is going back to the free enterprise system,' observes Houck. 'For 200 years, it worked pretty damn well.' "

Other feature articles deal with rising politicians, such as Richard Katz of California, who "has emerged as the leading legislative spokesperson for California's 2 million small businesses" (69); a study of the Komar lingerie manufacturing business and its 25-year old heir apparent; an analysis of the French economy, whose critical focus is that the French government "has long discouraged people from setting out to build companies on their own" (91); and an analysis of how a small Miami architectural firm got into difficulties by expanding too quickly.

"Inc." 's November 1984 issue also features, in the FYI space, a dialogue between several congressmen, conducted by Gendron. Gendron writes: "We began the two-hour session by asking each participant for his working definition of 'small business' as a political entity." (7). When the politicians have addressed that and other issues, the editor concludes:

"What will our votes mean for the pursuit of small businesses' interests in the next congressional session? Maybe more questions than answers. But the questions themselves are hardly trivial ones."

November 1984 issue at 11.

The eight competing covers and cover stories not previously discussed may be summarized as follows:

*Manhattan, Inc.*

October 1984: Carl Icahn, "The Lone Wolf of Wall Street."

December 1984: An article describing "The Gutfreunds' Hostile Takeover of the River House Roof" (John Gutfreund is the chief executive office of Salomon Brothers).

January 1985: Victor Gotbaum, "Blue-Collar Boss in a Black-Tie World."

February 1985: Diane Von Furstenberg, "Fashion's Comeback Kid."

March 1985: the members of the Tisch family, "Inside the $12 Billion Tisch Dynasty."

April 1985: J. Chiat, President of Chiat-Day, Inc., a bicoastal, California-based ad agency.

May 1985: Walter Wriston, former chairman of Citicorp; "What's He Up to Now?"

June 1985: American Stock Exchange President Arthur Levitt, Jr., who "gets the urge to merge."

*Inc.*

October 1984: the rise and fall of Nolan Bushnell, a Silicone Valley entrepreneur whose companies had failed.

December 1984: two cover articles, captioned "Honoring America's Fastest-Growing Private Companies" and "Saying No to Small Companies Has Never Been Easy."

January 1985: Jim Wyllie, President of Nyloncraft Inc., of Mishawaka, Indiana; "How One Company Transformed Itself By Taking Care of Its People—And Their Children."

February 1985: an article captioned "Food Fight," introduced on the cover as "when tiny Henri's Foods took on Kraft's Miracle Whip, it didn't know what it was getting into. Then again, neither did Kraft."

Jim Toreson of Xebec Corp. of Sunnyvale, California, a disk-drive controller company; "They say American can't manufacture anything these days. I say we have to meet the offshore challenge—or end up as consultants to the Japanese."

April 1985: unidentified male model, illustrating an article about the rising tendency of employees of successful small companies to demand shares in their companies.

May 1985: a survey of 1985's "Fastest-Growing Small Public Companies."

June 1985: cover photograph of eight Southern California technology executives to illustrate an article: "Networking '85—Welcome to the age of collaboration! Why

chief executives are banding together to solve one another's problems."

Thus a comparison of the two magazines—which need not be extended further—reflects significant differences in editorial content: its thrust and emphasis. "Inc." is exclusively about the business of a particular kind of company with a particular form of aspiration. "Inc."'s "beat" is nationwide; the companies which interest the magazine may be found in all fifty states; and it speaks to its audience in inspirational, "how-to" tones.

"Manhattan, inc." focuses solely upon New York City, but is not exclusively about business, at least *corporate* business. Thus its geographical scope is more narrow; but within those confines its editorial content is more broad. The magazine gives repeated emphasis to individuals one would not think of immediately as businessmen. The cover article on attorney Roy Cohn has been mentioned. Another example is the February 1985 feature article on Rudolph Giuliani, the present United States Attorney for this District. Mr. Giuliani has undoubtedly earned a notice in a magazine devoted to Manhattan's strivers and thrivers; but most readers would be surprised to find him or his office in a magazine devoted to "growing companies."

More subtle, more difficult to capture in words, and yet equally discernible are the differences between the magazines' essential natures and styles.[12] "Inc." is solemn; "Manhattan, inc." insouciant. It is the difference between education and entertainment; reverence and irreverence; gospel and gossip. "Inc." preaches the eighteenth-century virtues of the small, fiercely independent entrepreneur, striving to succeed and grow in the bewildering, changing technologies of the late twentieth century.

"Manhattan, inc." recounts the frequently controversial, racy or notoriuois public and private exploits of individuals who have achieved, and cling to, the precarious pinnacles of this fabled City's pyramids of success.

I do not intend to overstate the differences so as to obscure areas of overlap that exist between the two magazines. I am not quite prepared to accept a defense witness's characterizations of "Inc." as a "trade magazine" and "Manhattan, inc." as a "consumers' magazine."[13] But the differences in editorial content, style, geographical distribution and audience appeal, which we may collect under the caption "Product Proximity," are significant and readily apparent, and reduce the likelihood of confusion as to the source of these competing publications.

### 4. *Bridging the Gap*

The term "'bridging the gap' is used to describe the senior user's interest in preserving avenues of expansion and entering into related fields." *C.L.A.S.S. Promotions, supra,* at 18.

This is a factor militating in favor of the likelihood of confusion if, in a case where there are certain product differences, the senior user of a trademark proves an intent to expand its traditional activities and enter into a related field occupied by the junior user. In the case of magazines, the senior user must present evidence that it intends to publish a magazine "comparable" to that of the junior user. *C.L.A.S.S. Promotions, supra,* at 18.

There is no persuasive evidence of bridging the gap in the case at bar. The most that can be said for plaintiffs is that Goldhirsh and his colleagues have been giving

---

**12.** "Nature" and "style" are concepts which magazine people themselves apply to their publications. See, *e.g.,* Brendan Gill's criticism of a logo in *Here at the New Yorker* (Random House 1975) at p. 86:

"The drawing is wholly out of keeping with any impression of the nature of the magazine that the present editors would wish to convey to readers; nevertheless, when it was drawn, it must have been intended to symbolize what Ross and his board of advisory editors—Marc Connelly, Rea Irvin, George S. Kaufman, Alice Duer Miller, Dorothy Parker, and Alexander Woolcott—hoped would prove the spirit of their racy and sophisticated new publication."

**13.** Benson, Tr. 1014.

some thought (entirely undocumented, and never implemented by detailed planning) to publishing regional editions of "Inc.," with editorial content differing as to the regions. Quite apart from the tentative nature of such planning, there is no evidence that plaintiffs intend in such editions to emphasize that species of celebrity-conscious, people-oriented, name-dropping, social and professional (as well as business-identified) movers and shakers which dominates the pages and photographs of *Manhattan, inc.* It is necessary in analyzing this factor to identify the gap before evaluating the likelihood of the senior user's bridging it. From what I have seen of these two rival publishers, I consider it unlikely that the plaintiffs will bridge this particular gap.

## 5. *Actual Confusion*

 "No evidence of actual confusion is required in order to prove a likelihood of confusion." *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1024 (2d Cir.1979). However, "it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion." *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1136 (2d Cir.1979), citing and quoting *Affiliated Hosp. Prod., Inc. v. Merdel Game Mfg. Co.*, 513 F.2d 1183, 1188 (2d Cir.1975). Given significant volume of sales over time, isolated instances of actual confusion may be disregarded as *de minimis*. *C.L.A.S.S. Promotions, Inc., supra,* at 18, and cases cited.

It is important to remember that the Lanham Act is concerned with confusion among *consumers*. Plaintiffs must prove that "an appreciable number of reasonable consumers" would be confused as to source by defendants' title.

In a case involving magazines, the principal groups of potentially confused consumers are (a) advertisers; (b) subscribers; and (c) newsstand purchasers.

Generally speaking, an infringement plaintiff undertakes to prove actual confusion between his and the defendant's product in two ways: anecdotal evidence of particular incidents, and market research surveys. Plaintiffs at bar offer evidence in both categories.

### (a) *Anecdotal Evidence*

With the exception of one rather doubtful incident, there is no evidence of actual confusion on the part of a consumer of these magazines, as that term has been defined.

### i. *Advertisers*

One manifestation of confusion among advertisers would be an ad placed in "Manhattan, inc." under the mistaken impression that plaintiffs, and not defendants, published that magazine.

Plaintiffs offer no proof that such an incident has ever occurred. Furthermore (and to anticipate the ultimate analysis of likelihood of confusion), I find on the evidence that the prospects of this particular form of consumer confusion are virtually non-existent.

That is because of the highly structured, multi-layered manner in which advertisements get into magazines.

Imagine a hypothetical major corporation that wishes to advertise its goods or services. Its public relations staff establishes an advertising budget to be distributed among the various media: television, radio, magazines, newspapers, billboards, skywriting, and so on. Usually—if not invariably—the corporation hires an advertising agency. The agency has itself an elaborate heirarchy of researchers and executives, ultimately charged with the responsibility of recommending to the client corporation just where its advertising dollars should be spent. But the agencies frequently do not rely solely on their own research and thought processes. There exist media consultants who advise ad agencies about what to advise advertisers about ads. Some of these consultants—one testified at trial—specialize in advertising *in magazines*. In aid of their expertise, these consultants (as well as the agencies themselves) have access to market research gen-

erated, computer stored data of Orwellian detail about magazines and their readers. There are also trade tools such as the SRD, described *supra,* in which magazine publishers describe their publications and publish their advertising rates. People involved in the placing of ads in magazines use these resources and tools.

Given this wealth of information and interlocking levels of responsibility for recommending and placing ads, I consider it most unlikely that an advertiser would place an ad in Mr. Lipson's magazine "Manhattan, inc." under the mistaken impression that he was advertising in Mr. Goldhirsh's magazine "Inc." (or, indeed, any regional edition of "Inc." which may be published in future). Judge Sweet reached a similar conclusion in *Vision, Inc. v. Parks,* 610 F.Supp. 927 (S.D.N.Y.1985), a magazine title case:

> "The focus of Vision Inc.'s concern is on its advertisers, who might be confused by the existence of a similarly named publication in the same city as Vision Inc. However, as the court noted in *McGregor-Doniger, Inc. v. Drizzle, Inc., supra,* 599 F.2d at 1137, 'the greater the value of an article the more careful the typical consumer can be expected to be.' An advertising executive purchasing advertising space is not an impulse buyer and is unlikely to be confused as to the publication in which he is placing an ad. The sophistication of VISION USA's actual 'buying public', therefore, suggests that the actual confusion would be unlikely." At 932.

An alternative form of potential confusion among advertisers, suggested by certain of plaintiffs' witnesses, may be characterized as the "foot in the door" or "fraudulent entry" phenomenon. The scenario goes like this. An ad salesman for "Manhattan, inc." makes an unsolicited telephone call to a prospect at an advertising agency. "I'm from 'Manhattan, inc.,'" he says, deliberately (or by inadvertence) slurring the "Manhattan" and stressing the "inc." The agency man believes that the salesman is from "Inc." magazine, and be-

cause of its fine reputation, he grants an interview. Of course, the truth will emerge soon enough during the interview; but the salesman has gotten his foot in the door, and is thus able to make his spiel. There is no proof that this scenario has ever been enacted. Indeed, I regard it as a most unlikely one. I accept the testimony of defendants' advertising executives that the best way to interest an advertiser in a new publication such as "Manhattan, inc." is to stress (if it be the fact) that the publisher has a prior track record of other successful magazines. This achieves both credibility and a "foot in the door." Defendants' witnesses testified, and I find, that the "Manhattan, inc." sales representatives invariably stressed in their presentations to advertising agencies that this was a Metrocorp publication, and that Lipson, the successful publisher of "Boston," "Philadelphia" magazines, was behind the new venture. It was to defendants' interest to stress that publishing pedigree, and its representatives in fact did so. Actual confusion of the "foot in the door" variety is a theory which is not only unproved but contrary to the evidence.

### ii. *Subscribers*

There is no evidence that anyone subscribed to "Manhattan, inc." in the mistaken impression that it was a regional edition of "Inc.," or other product of plaintiffs' publishing house.

Presumably, if such misdirected subscriptions had been placed, the misled subscriber (having received his first copy of "Manhattan, inc." and been appalled by it) would have complained either to the publisher of "Manhattan, inc." or to the publisher of "Inc." Complaints falling within the first category, while not coming to plaintiffs' attention in the first instance, would have been discoverable. Complaints falling within the second category would have been directed to plaintiffs, who would undoubtedly have offered them in evidence if received.

### iii. Newsstand Purchasers

There is a comparable lack of evidence of actual confusion with respect to the purchase by readers of copies of "Manhattan, inc." at newsstands.

This absence of evidence of actual consumer confusion is noteworthy because the magazines have been in actual competition with each other for eleven months. "Manhattan, inc." has achieved a monthly circulation of 50,000 copies, and "Inc." has a somewhat larger monthly circulation in the New York City area. Both magazines energetically pursue advertisers and readers through advertising sales personnel, direct mailings, and other strategies. Isolated incidents of confusion among advertising agencies or subscribers have been disregarded as *de minimis* in comparable circumstances. *C.L.A.S.S. Promotions, Inc., supra,* at 18. Here there is no such evidence.

None, that is, unless we consider the testimony of Joel Novak as falling within that category. Novak, a witness for plaintiffs, is a publicity consultant. He testified that he first became aware of "Manhattan, inc." when he saw a copy displayed on a newsstand in the Pan Am building. Novak continued:

Q. "And what was your reaction when you saw Manhattan, inc.?"

A. "Well, it may have been the wrong reaction, but I thought Bernie Goldhirsh had published a regional edition of Inc. magazine. I picked up the magazine. It wasn't until I opened it and looked at the masthead and saw it was not part of the Goldhirsh group."

Tr. 255–56.

Novak was not really a "consumer"; he is in the business, and he periodically inspects the newsstands "to see who's doing what in the industry, in effect." *Ibid.* Defendants attack Novak's credibility because of his social and business relations with Goldhirsh; and on the ground that it is unlikely that Novak, being in the business, had not heard of "Manhattan, inc." earlier. These are valid points, but I need not characterize Novak's testimony as unreliable to disregard it under the *de minimis* rule.

### iv. Other Anecdotal Evidence

The bulk of plaintiffs' anecdotal evidence of actual confusion consists of testimony of a number of witnesses about what other persons asked them or said to them.

 The declarants themselves did not testify; thus in most cases we do not know why they asked what they asked or said what they said. These declarations are not barred by the hearsay rule. An inquiry is not an "assertion," and accordingly is not and cannot be a hearsay statement. Rule 801(a), (c), F.R.Evid. Statements of the declarant's then-existing state of mind fall within the exception of Rule 803(3); *see also Executive Employment Service, Inc. v. Executives Unlimited, Inc.,* 180 F.Supp. 258, 262 (E.D.Pa.1960). However, the probative value of such declarations is reduced by uncertainty as to what induced them. In a case where the issue is whether defendant's mark caused confusion, "[t]he relevant question ... is what induced [the] state of mind" revealed by the declaration. *Executive Employment Service, supra,* at 262. *Cf. Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 48 (2d Cir.1978) ("There was some evidence of clerical errors and joint advertising involving the two companies' products, but in the absence of any testimony to explain these events, the court was clearly entitled to find that they did not demonstrate actual confusion among retail customers.").

These considerations do much to vitiate plaintiffs' evidence of actual confusion, elicited from witnesses either employed by plaintiffs or affiliated with them. That evidence may be briefly reviewed.

*Misdirected telephone calls.* "Inc."'s receptionists at the Manhattan office testified that they received a number of telephone calls where the caller was trying to reach "Manhattan, inc." There is no way of knowing whether any caller had been confused by defendants' title. The evidence shows that it is more likely that the telephone company's assistance operator,

asked for the number of "Manhattan, inc.," thought the caller wanted the Manhattan listing for "Inc."

*Various third-party declarations.* Numerous "Inc." employees or associates described what other individuals had asked or said to them in a variety of circumstances. The majority of these declarations were inquiries as to whether or not there was a "relationship" between "Inc." and "Manhattan, inc."; or if the latter was a "spinoff" of the former; or if "Inc." was launching a regional edition; or if an "Inc." employee was working for "Manhattan, inc." These inquiries, the witnesses testified, came from people in advertising or publishing; one from a professor of journalism, and several from family members.

Some declarations were different. A lawyer friend of an "Inc." executive, noticing the name "Manhattan, inc." on the directory of his office building, expressed satisfaction that it would now be easier to meet for lunch. Other declarations indicated belief (as opposed to an inquiry) that an "Inc." employee was in fact employed by "Manhattan, inc." An "Inc." advertising salesman testified that he received a number of telephone calls from "media buyers" asking for "Manhattan, inc." 's rates. A photographer assigned by plaintiffs to photograph newsstand displays testified that the vendor, when asked for a copy of "Inc.," handed her "Manhattan, inc."

I have carefully considered all this evidence, and conclude that there is less to it than meets the eye. These declarants—with the possible exception of the unidentified "media buyers," were not consumers, actually contemplating placing an ad or subscribing to or purchasing the magazine. Therefore their inquiries or statements are of diminished relevance. Furthermore, in almost all cases we have no idea what prompted the declarations. Plaintiffs ask me to infer that it is the similarity of names alone, but there are other possible explanations. *Cf.* Judge Van Dusen's comment in *Executive Employment Service, supra,* at 262:

"Under these circumstances, the court does not think it is fair or proper for it to make the inferences the plaintiff desires from the facts of this call when the caller could be produced and explain, subject to cross-examination, what induced his belief that he was calling the respondent." (footnote omitted).

Finally, certain of the inquiries were apparently made early on, before "Manhattan, inc." had actually appeared, with a concomitant ability for sophisticated consumers to appreciate the differences in editorial content. Inquiries among members of the gossipy world of publishing about a new venture in the planning stage do not readily translate into evidence of confusion as to the finished product on the part of "an appreciable number of reasonable consumers."

I am bound to say that this anecdotal evidence, viewed within the context of eleven months of competition between published magazines, preceded by defendants' advertising and solicitation campaign, does not constitute particularly impressive evidence of that actual confusion among consumers which is significant in cases of this nature. In *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3rd Cir.1978), cited with approval on the point by the Second Circuit in *C.L.A.S.S. Promotions, supra,* at 18, the Third Circuit said of nineteen misdirected letters over a four year period:

"We think that the court committed error in discerning from this extremely minimal evidence a 'pattern of confusion in the marketplace.'"

589 F.2d at 1231.

The evidence at bar is no more persuasive.

To be sure, the Second Circuit has more than once "commented upon the difficulty of establishing actual confusion on the part of retail customers," *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 48 (2d Cir.1978), and cases there cited. Nevertheless, the senior user undertaking to establish actual past confusion as a basis for inferring the likelihood of future confusion must, if the evidence is to be probative on

the issue, demonstrate more than has been shown here. To the extent that the declarations are those of nonconsumers and the evidence does not reveal why they were made, they are not probative. Declarations arguably falling within a more probative category are *de minimis* in the totality of circumstances.

### (b). *Survey Evidence*

Plaintiffs conducted a telephone survey of present "Inc." subscribers. The survey was conducted by Hase Schannen Research Associates, Inc. The survey's methodology and findings were described at trial by Robert Shullman, a Hase Schannen vice president; defended by Shullman and Professor Lawrence Wortzel, an expert witness called by plaintiffs; and vigorously attacked by Professor Yoram Wind, an expert witness called by defendants.

It is by now well settled that surveys are admissible into evidence for the purpose of establishing the existence or the likelihood of confusion in the minds of consumers. *Universal City Studios v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984); *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F.Supp. 1189, 1204–05 (E.D. N.Y.1983). However, "[t]he survey must ... have been fairly prepared and its results directed to the relevant issues." *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, *supra*, at 118, citing and quoting *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*, 532 F.Supp. 651, 657 (W.D.Wash.1982). In *Toys R Us, Inc.*, *supra*, Judge Glasser summarized the relevant criteria:

"The trustworthiness of surveys depends upon foundation evidence that (1) the 'universe' was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the pur-

pose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) objectivity of the entire process was assured. Failure to satisfy one or more of these criteria may lead to exclusion of the survey."

559 F.Supp. at 1205.

Based on these criteria, the defendants at bar objected strenuously to the admission into evidence of the Hase Schannen survey. However, I agree with Judge Glasser in *Toys R Us, Inc.*, *supra*, that in a non-jury trial, the better course is "to receive the evidence and then ignore it or give it such weight as the court [thinks] appropriate." *Id.* at 1202. That is the course I have followed in this case. It is now necessary to consider the survey in greater detail, together with defendants' objections to it.

Hase Schannen Research Associates, Inc. (hereinafter "HS") was first called by John Carlson, an executive at "Inc." Carlson asked HS "if we would conduct a survey to assess the confusion factor if any between Manhattan, inc. and Inc. magazine."[14] The universe selected for the study was "Inc." subscribers in Manhattan. The magazine selected the universe, but Shullman concurred in it. After a series of pre-tests, HS worked up a questionnaire consisting of five questions with various sub-parts. Plaintiffs furnished HS with a complete list of all subscribers in Manhattan. HS used "standard random sample procedures to select the sample," which consisted of 250 "Inc." subscribers.[15] HS entrusted the actual telephone interviews to Telespecs Research Services, Inc., who president, Merle Klein, also testified at trial. Telespecs employees dialed the numbers, asked the questions, and recorded the answers. The completed questionnaires were then returned to HS for further data processing.

The five key questions (with subdivisions) actually put to the 250 "Inc." subscribers on the telephone were as follows.

---

**14.** Shullman, Tr. 353.

**15.** *Id.* at 355.

The first two questions are characterized by Shullman as "warmup" questions. They are divided into subparts. Question 1a reads:

"First, when you think of sources of publicly available business information and news (such as magazines, daily, weekly, and monthly newspapers, newsletters, radio, TV, etc.), what is the first name that comes to mind?"

Question 1b inquires into the "second name that comes to mind," and question 1c asks "what other names come to mind?" The interviewer had before him a form listing a number of publications, together with spaces to write in the names of other publications. The interviewer's job was to mark up the form in accordance with the respondent's answer.

Question 2a asks the respondent to tell the interviewer "the names of all the business news and information publications you read regularly." There are three follow-up questions on this general subject which I need not further consider.

It is at question 3 that the survey sharpens its focus upon the business at hand. Under question 3a, the interviewer says this over the telephone to the respondent:

"Now I'm going to read the names of five magazines. Please listen to the names of these magazines and tell me if any of these magazines sound to you as if they might have the same publisher."

The interviewer then read the names of the following five magazines: "Business Week"; "Fortune"; "Inc."; "Money Magazine"; and "Manhattan, inc." The order in which the names of these five magazines were read varied from respondent to respondent.

The interviewer then asked:

"Now, do any of the magazines I just mentioned sound as if they might have the same publisher?"

The respondent was asked to respond "yes" or "no."

The interviewer then moved to question 3b, and said:

"Which magazines sound to you as if they might have the same publisher?"

The magazines identified in response to this question were marked off on the interviewer's questionnaire sheet.

The interviewer then posed question 3c: "Why do the magazines you mentioned sound as if they might have the same publisher?"

The interviewer recorded the variety of the respondents' answers.

On question 4a, the interviewer said to the respondent:

"I'm going to read the list of magazines one more time. This time please tell me if any of these magazines sound to you as if they might contain similar types of articles and information."

The names of the same five magazines were again read; the respondent answered "yes" or "no"; and then answered follow-up questions comparable to those quoted in connection with question 3.

For question 5, the interviewer asked the respondent the following:

"Do you think Manhattan, inc. magazine might be a regional version of Inc. magazine?"

The three recorded answers were "yes," "no," or "don't know." The questionnaire then concluded with eleven questions for "classification purposes," dealing with work, work title, education, age, income and the like.

After tabulating the interview results, HS prepared a written report. The report contains (at p. 5) a "Summary Table of Perceived Relationships between Inc. and Manhattan, inc." That table reads as follows:

| BASE: TOTAL RESPONDENTS | (250) |
|---|---|
| Percentage of respondents who said that ... | |
| Inc. and Manhattan, inc. might have the same publisher | 12% |
| Inc. and Manhattan, inc. might contain similar types of articles and information | 19 |
| Manhattan, inc. might be a regional version of Inc. magazine | 26 |

Inc. and Manhattan, inc. are
related in any of the above ways 41%

The final 41 percent figure reflects a number of respondents who answered affirmatively to one or more than one of the three preceding categories.

On the basis of these responses, HS concluded, under the caption "Summary of Significant Findings" (report at p. 1):

> "The primary finding of this study was that a significant proportion of consumers interviewed felt confused about the relationship between Inc. magazine and Manhattan, inc."

Consideration of the survey's evidentiary value must focus upon the questionnaires themselves, rather than upon the HS report's summary of the results. There are significant distinctions. Thus the report's "Summary Table of Perceived Relationships" alters by paraphrase certain of the questions put by the interviewers to the respondents. The summary table states that 12 percent of the respondents "said that ... Inc. and Manhattan, inc. might have the same publisher." But as we have seen, the respondents were actually asked whether five selected magazines *"sound as if* they might have the same publisher." The SH report obscures the fact that the interviewees were responding solely to aural stimuli, as opposed to the combined aural and visual stimuli which would be available if the respondents had been shown the magazines, or even their logos.

I appreciate that the survey's methodology is adequately described elsewhere in the report, which contains a copy of the questionnaire as an appendix. But it is fair to place the report's summary tables in context.

Another comment must be made about the percentages set forth in the HS report.

Those percentages of "perceived relationships between Inc. and Manhattan, inc." are not limited to those respondents who said that *only* "Inc." and "Manhattan, inc." sounded as if they might have the same publisher, or have similar contents. Rather, they embrace respondents who said that anywhere from two to all five of the selected magazines fell within those categories, so long as "Inc." and "Manhattan, inc." were two of them. This method of calculation exaggerates the statistics in respect of perceived relationships between "Inc." and "Manhattan, inc." *inter se.*[16]

As to the questionnaire itself, I am persuaded by the evidence that it is seriously flawed.

The first area of concern relates to the survey's universe. The universe was limited to individuals who had in the past decided to subscribe to "Inc." No effort was made to include in the test universe individuals who were contemplating subscribing to "Manhattan, inc." or "Inc."; or who subscribed to both magazines.

The Second Circuit was critical of a comparable universe in *Universal City Studios, Inc. v. Nintendo Co., Ltd., supra,* at 746 F.2d 118:

> "The survey utilized an improper universe in that it was conducted among individuals who had already purchased or leased Donkey Kong machines rather than those who were contemplating a purchase or lease."

In voicing that criticism, the Second Circuit cited *American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 661 n. 4 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980), in which the court said:

> "Moreover, the survey participants, although former purchasers of hiking

---

**16.** Defendants' survey expert, Dr. Wind, examined the completed questionnaires and calculated the percentages of respondents who linked *only* "Inc." and "Manhattan, inc." On that reduced basis, the percentage of affirmative answers to Question 3b falls from 12 percent to 8.8 percent, and to Question 4b from 19 percent to 4.8 percent. To the extent that the survey answers are probative at all (see discussion in text *infra*), the reduced percentages are more meaningful. The purpose of the survey was to test the likelihood of confusion between "Inc." and "Manhattan, inc." as the result of defendants' allegedly infringing mark. I do not see what light is cast on that issue by a respondent who acknowledges the possibility of similarity between "Inc.," "Manhattan, inc.," and one, two, or three *other* magazines.

boots, did not necessarily have any present purchasing interest concerning the particular matter being surveyed."

By such statements, the Second Circuit reveals its acceptance of the principle that "[t]o be probative and meaningful ... surveys ... must rely upon responses by potential consumers of the products in question." *Universal City Studios, Inc.,* supra, at 118, citing and quoting *Dreyfus Fund Inc. v. Royal Bank of Canada,* 525 F.Supp. 1108, 1116 (S.D.N.Y.1981).

Plaintiffs' defend this limited universe by arguing that individuals already familiar with "Inc." magazine would be the least likely to be confused by a similarity in the name of another magazine. I do not find this *apologia* persuasive. In my view, it is more likely that individuals familiar with "Inc." magazine would be more likely to focus upon the point of similarity arising out of the only other magazine in the selected list with "Inc." in its title.

The second difficulty relates to the exclusive use of a telephone survey. Telephone surveys are not *per se* unreliable; they can also be usefully combined with other methods, such as the preliminary dissemination of materials by mail. It is obvious, however, that when the inquiry is limited to a telephone survey, significant stimuli are eliminated. The respondents in a telephone survey are responding only to aural stimuli; in layman's language, to the sounds of names. But we are concerned with magazines. The covers of magazines are seen. The contents of magazines are read. Such activities give rise to visual and cerebral stimuli. They can play no part in a telephone survey such as the one at bar. The distinction is significant, since, as noted *supra,* the courts require that trademarks be considered in their entirety in order to evaluate the likelihood of confusion. We are told not to fragmentize. But it seems to me that separating the sound of a magazine's title from its appearance and contents raises fragmentizing to a high power. Cf. *Thompson Medical Co., Inc. v. Pfizer Inc.,* supra, in which the Second Circuit,

speaking critically of a survey, said at 753 F.2d 211 n. 2:

"The survey was conducted by telephone; consequently the respondents were unable to examine the packages."

I am also troubled by the repeated use of the word "might" in questions 3, 4 and 5. Do any of these magazines sound "as if they *might* have the same publisher?" Or *"might* contain similar types of articles and information?" "Do you think Manhattan, inc. magazine *might* be a regional version of Inc. magazine?" "Might," on the scale of probabilities, occupies a low station. "Might" suggests what is *possible,* not what is *probable* or *likely.* I am doubtful of its propriety where the controlling legal standard is *likelihood* of confusion. Plaintiffs defend the word on the theory that a more positive question would provoke more respondents to answer: "I don't know." The point may perhaps be conceded, but not the defense. If the researchers' purpose is to discover whether or not a likelihood of confusion exists, "I don't know"—which in this context may fairly be equated with "I'm not confused"—is a useful answer. If, of course, the object of the exercise is to *demonstrate* confusion, the answer is useless, or worse. I am generally distrustful of "might" as a truth-seeking device. A trial judge routinely sustains objections to questions such as "Could your mother-in-law have been in Pittsburgh on Hallow'een?" "Objection to the form," says counsel; "anything is possible." "Sustained," I say; "the jury will disregard the question." The analogy seems fair.

The use of "might" in this survey is particularly troublesome because the word forms an important part of leading questions, which give rise to independent problems even more serious.

For obvious reasons, the courts condemn the use of leading questions in purportedly scientific surveys such as these. "A survey question which begs its answer cannot be a true indicator of the likelihood of consumer confusion." *Universal City Studios, Inc.,* supra, at 118.

But what are we to make of questions which ask which magazines sound "as if they might *have the same publisher*?" Or *"contain similar types of articles and information*?" And finally, question 5. A primary concern of plaintiffs', we know, is that consumers would mistake "Manhattan, inc." for a regional version of "Inc." The question makes no effort to conceal, and thereby permit to emerge unaided, that particular, dreaded connection. On the contrary, the question unabashedly proclaims the connection: "Do you think Manhattan, inc. magazine might be *a regional version of Inc. magazine*?"

No detailed analysis is needed to demonstrate the leading nature of these questions. But *Universal City Studios, supra,* offers a useful comparison. The owner of the trademark "King Kong" (the famous film gorilla) brought an infringement action against the manufacturer of a video game named "Donkey Kong" which also featured a gorilla. Plaintiff conducted a telephone survey of 150 arcade, bowling alley and pizza parlor owners who had purchased or leased one or more Donkey Kong games. The individuals surveyed were asked this question:

"To the best of your knowledge, was the Donkey Kong game made with the approval or under the authority of the people who produce the King Kong movies?"

Plaintiff argued that an 18 percent affirmative response proved the existence of actual confusion. The Second Circuit held it proved nothing because the question was leading:

"... the above-mentioned inquiry was an obvious leading question in that it suggested its own answer. The participants were presented with the Donkey Kong-King Kong connection rather than permitted to make their own associations. When the participants were asked 'As far as you know, who makes Donkey Kong?" not one suggested Universal or the makers of the King Kong movies." 746 F.2d at 118.

I perceive no difference between the question condemned as leading in *Universal City Studios* and those in the case at bar. They are leading because the respondents were presented with particular similarities (same publisher, similar contents) or associations (regional version), rather than permitted to arrive at them themselves. To avoid leading questions in the instant case, the respondents could have been asked to consider a group of magazines, and then asked: "Do you think there is any relationship between any of these magazines? Which ones? What is the relationship?" The answers to these or comparable questions would have constituted the unconditioned, unfettered operation of the respondents' minds. I can have no such confidence in this survey.

Defendants find other faults with the HS survey. But I have said enough to indicate why I cannot accord it probative value as evidence of actual (or likely) confusion.

The evidence in this case of significant actual confusion among consumers in the marketplace is not persuasive.

### 6. *Good Faith*

■ In trademark infringement cases the concept of "good faith" addresses the issue of whether or not the junior user deliberately copied the senior user's mark, in the illicit hope of "palming off" his product.

I find that the defendants at bar acted in good faith in selecting the title "Manhattan, inc." The intention of publisher Lipson, in selecting a title for his new magazine, was to send a signal "to the people we were marketing to that this was a little different, it was not the traditional city magazine, and, on the other hand, it wasn't a traditional business magazine." [17] That testimony is perfectly plausible; it reflects the editorial content of the magazine as it evolved. The title selected achieves what was intended. The word "Manhattan" suggests a regional emphasis—not a "tradi-

**17.** Tr. 544.

tional business magazine"—while the addition of "inc." indicates that it is "not the traditional city magazine." While I have held that the word "Inc." has achieved a certain strength as the title of plaintiffs' magazine, it is also the fact, as Lipson testified, that: "Inc. is affixed to many things today."[18] Defendants affixed "inc." to the word "Manhattan" to suggest that certain aspects of Manhattan living would be featured in the magazine. The accompanying descriptive phrase—"The Business of New York"—echoes that theme, although the editorial content of the magazine, as contemplated at the time defendants adopted their mark and as it eventually emerged, demonstrates that "business" is not limited strictly to commerce. Rather, the magazine concerns itself with a broader concept of "business": who moves in Manhattan's corridors of power, how did they get there, are they about to trip up, where do they eat lunch, buy their shirts and hats.[19] The title as finally selected cleverly reflects these themes; and I am not satisfied that defendants made that selection in bad faith.

As for the logo, it was designed by Walter Bernard, a principal of WBMG Incorporated, whose principal business is magazine design and development. All witnesses at trial, including Mr. Bernard, regard Mr. Bernard as perhaps the foremost practitioner of his art in the nation. I am satisfied that they are all correct in their estimates. Bernard was given *carte blanche.* He designed the logo, and selected the logo type.

In denying defendants' motion for a directed verdict at the end of plaintiffs' evidence, I expressed the view that the logo type selected by defendants appeared very close to the logo type on plaintiffs' magazine. I am now satisfied, however, that Bernard was not influenced in any way by the cover of "Inc." when he designed the cover for "Manhattan, inc." As noted previously, the type faces are different: one is

Times Roman and the other Caslon. Both typefaces are members of a family of styles which rather closely resemble each other, as is evidenced by the covers of five magazines in which the letters "in" or "inc" appear next to each other. DXAK. But Bernard testified, and I accept, that he selected Caslon serif type because he regarded it as particularly elegant. It was his selection; defendants played no part in it; and Bernard was not influenced by the cover of "Inc." Accordingly I draw no inference of bad faith from the logo type defendants use.

When Bernard forwarded his draft logo to the editorial staff at "Manhattan, inc.," the "I" in the second word was capitalized. The editorial staff changed the logo to its present appearance, with that "I" set in lower case. I draw no inference of bad faith from that alteration. I accept Lipson's testimony as to his reasons for giving final approval to that design:

"I thought that was a brilliant—I don't know who did that, whether it was Walter Bernard, Milton Glazer or Jane Amsterdam, but it was done because the logo was trying to capture the nuances of the magazine and the character of the magazine, and the small 'I' was used by the designers to signal that we wre not a heavy nut-and-bolts business magazine, a how-to, we will do our annual story on the tire industry and big steel and all that kind of stuff which I usually find tedious. It was somewhat irreverent, a little gossipy. It would be fun. It was kind of a sexy business magazine, as it were."

Tr. 545–46.

I appreciate that, as of late July 1984, Lipson had been placed on notice by plaintiffs' counsel that plaintiffs objected to the use of the word "inc." in defendants' title; and that defendants proceeded regardless. But that chronology does not establish "bad faith" in the present context. In *Po-*

---

18. *Ibid.*

19. While "Manhattan, inc." does contain an occasional article about small companies, for the most part they consist of expensive specialty shops purveying upscale items to upscale people.

laroid Corp., *supra,* Judge Friendly summarized this factor as "defendant's good faith in *adopting* its own mark." (emphasis added). Defendants had made that adoption several months before they received plaintiffs' protest. Defendants declined to change their mark because they did not accept plaintiffs' claim of infringement. Defendants were entitled to reject plaintiffs' demand in good faith.

### 7. Quality of Defendants' Product and Sophistication of the Buyers

The last two factors enumerated in *Polaroid* may be considered together briefly.

The high quality of defendants' magazine is not contested by the plaintiffs.

As for the sophistication of the buyers, it is high in respect of both magazines. I have touched upon the demographics of the readerships *supra.* Suffice it to say for present purposes that the readers who subscribe to both magazines are successful, educated, relatively affluent, business or profession-oriented people. In short: they are sophisticated. And those who decide which advertisements shall be placed in which magazines are, if anything, even more sophisticated in the manner in which they make their marketing decisions.

These high levels of sophistication militate against the likelihood of confusion in the marketplace. The case at bar may be contrasted with *Blake Publishing Corp. v. O'Quinn Studios, Inc., supra,* where I had occasion to write:

> "The nature of the market to which the two magazines appeal further enhances the likelihood of confusion. Children under 16, who comprise a substantial portion of plaintiff's readership, are not likely to bring a great deal of care and sophistication to their purchasing decisions. Magazines which emphasize 'monsters' appeal to children at the younger, and even less sophisticated, end of the age scale."

202 U.S.P.Q. at 858.

### 8. Other Equitable Factors

As previously noted, the factors listed in *Polaroid* are not exhausted. In any given case, the court must consider a broad spectrum of equities; and each case turns on its own circumstances. In *Chandon Champagne Corp. San Marino Wine Corp.,* 335 F.2d 531, 534 (2d Cir.1964), Judge Friendly wrote:

> "In contrast to patent and copyright law, the concept of priority in the law of trademarks is applied 'not in its calendar sense' but on the basis of 'the equities involved.'"

(Citing and quoting 3 Callmann, *Unfair Competition and Trade-Marks* 1189, 1198–99 (2d ed. 1950).

Because that is so, Judge Friendly continued in *Chandon:*

> "... we have likewise emphasized that, in such cases, 'against these legitimate interests of the senior user are to be weighed the legitimate interests of the innocent second user' and that we must balance 'the *conflicting interests* both parties have in the unimpaired continuation of their trade mark use.'"

*Id.* at 536 (emphasis in original).

*Chandon* regarded the plaintiff's delay in asserting its claim as an equitable factor militating in favor of the defendant-junior user of the name. More recently, the Second Circuit stressed that factor in *Citibank, N.A. v. Citytrust,* 756 F.2d 273 (2d Cir.1985). That case arose within the context of a motion for preliminary injunction. Plaintiff Citibank, complaining of defendant's use of the name "Citytrust," waited ten weeks before filing the complaint and moving for a preliminary injunction. The Second Circuit, stressing the need for a showing of irreparable injury to obtain a preliminary injunction, vacated the injunction issued by the district court, and stated:

> "In short, Citibank's failure to act sooner 'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.' *Le Sportsac, Inc.* [*v. Dockside Research Inc.*],

478 F.Supp. [602] at 609 [ (S.D.N.Y. 1979) ]."

756 F.2d at 277.

The rationale of *Citibank* does not apply squarely to the case at bar. The plenary trial on plaintiffs' suit for permanent injunction has been completed; we are no longer in the realm of a preliminary injunction. Nonetheless, *Citibank* stresses the need, as does *Chandon,* for prompt action by the senior user of a trademark, since "the owner's delay in asserting his rights may lead the defendant to build up innocently an important reliance on the publicity of his mark, so that its loss would cost dearly." *Chandon, supra,* at 535. That is an element in the case at bar, since plaintiffs first learned of defendant's intention to use the title "Manhattan, inc." in early April 1984, and did not instruct counsel to write in protest until late July. During that interim, the evidence shows, defendants were exercising maximum efforts, and incurring considerable expense, to publicize and market their new title and product.[20]

Defendants argue that these circumstances give rise to laches and estoppel which provide an alternative basis for denying plaintiffs injunctive relief. If plaintiffs had made a strong showing of likelihood of confusion, I would not have regarded plaintiffs' inaction between April and July as rising to the level of an equitable bar to relief.[21] But in point of fact, plaintiffs have made an inadequate showing of likelihood of confusion; and to the extent there is any substance to their case, the equitable arguments available to defendants (and they do exist) further militate against relief.[22]

## 9. *Likelihood of Confusion*

■■ For reasons at least partially articulated in the foregoing analysis, I hold that plaintiffs have not proved a sufficient likelihood of confusion as to the source of "Manhattan, inc." to entitle them to equitable relief.

Significantly dissimilar marks appear on the covers of magazines whose editorial contents, while overlapping to some degree, are nonetheless strikingly different. There is no persuasive evidence of appreciable actual confusion among advertisers, subscribers or readers; and little prospect that these highly sophisticated consumers will be misled in future. Because the magazines are different, a "gap" between the products exists; but plaintiffs have not proved that they intend to bridge the particular gap that exists. Defendants acted in good faith. There are other equitable considerations which favor them.

## VII.
## CONCLUSION

Plaintiffs' application for a permanent injunction and an accounting is denied. The Clerk of the Court is directed to enter an order dismissing the complaint with prejudice, and with costs in an amount to be taxed by the Clerk.

It is SO ORDERED.

---

**20.** Plaintiff's counsel argued in summation that during the early April-late July interval, plaintiffs were only gradually becoming aware of the nature of defendants' magazine, and acted as soon as they were fully advised. Tr. 1254–55. There is nothing in Mr. Goldhirsh's testimony to support that suggestion of slowly dawning horror. On the contrary: he testified that the early April mailing contained sufficient consternation to cause him to consult counsel. Tr. 26–27.

**21.** That is the key period for laches and estoppel, since after counsel's July letter defendants proceeded at their peril.

**22.** I am inclined to accept plaintiffs' argument that defendants could minimize their losses and risk of harm by changing their name and logo to, say, "Manhattan & Co." Defendants expert witnesses speak of such an enforced change in doomsday terms which seem rather farfetched. However, since plaintiffs have failed to prove likelihood of confusion and, consequently, trademark infringement, there is no basis in fact or law to compel defendants to do anything.

As noted *supra,* one of plaintiffs' primary concerns is the possibility that competing magazines may crop up in other cities, with a title comprised of the name of the city and the suffix "Inc." It should be apparent from this opinion that each case depends on its own circumstances, which (in the case of magazines) include such variables as totality of the mark and editorial content. Precedential value in this area of law is limited.

## SPECIAL ISSUE

THE MAGAZINE FOR
GROWING COMPANIES

# Inc.

(R)

JULY 1985
$3.00

Ronald Reagan
Michael Levy
Alicia Paige
William Rukeyser
Youa Her
Stewart Brand
J. Presper Eckert
William Hewlett
David Packard
Ann Eis
Jack Eckerd
Jim Cox
Gale Sayers
Xavier Roberts
Mary Kay Ash
John Akers
Andrew Kay
David Kay
Barbara Procter
William Winpisinger
Frank Borman
Francis "Skip" Carroll
Lester Thurow
T. Boone Pickens
Kevin Phillips
Michael Dukakis
Allan Gallant
Rafael Collado
Joel Hyatt
Susan Hyatt
Maynard Jackson
Rosemary Ruiz

# THE SPIRIT OF INDEPENDENCE

*Voices from America's Economic Frontiers*

APPENDIX B

**WINE WARS • DAVID MICHAELIS ON THE PRICE OF THE PERFECT BABY
THE MODEL VANISHES • INSIDE THE BENEFIT BUSINESS • SHIRT TALE**

The Business of New York

**JULY 1985** **$2.95**

# TROUBLED DAYS AT DOUBLEDAY

## Nelson Plays Hardball With His Book Biz

### By John Taylor

